In the Matter of SUMMA T CORP., INT'L, Summa T Realty, Inc., Diversified Financial Services Corp. of America, Summa Management Co., Summa T Mortgage Co., Inc., David R. Kane, Interglobal, Inc., Milligan Interiors, Inc., Realty Consultants, Inc., Diversified Financial Services Corp., Int'l, IEI Realty, Inc., Sidetrack, Inc., Campbell Management, Inc., Mid-America Properties, Inc.

Charles Darwin DAVIDSON, trustee in bankruptcy, Plaintiff,

v.

UNITED STATES of America INTERNAL REVENUE SERVICE, Defendant.

Bankruptcy Nos. LR 82–1235, LR 82–1237, LR 82–1231, LR 82–1230, LR 82–1223, LR 82–1238, LR 81–1232, LR 82–1227, LR 82–1234, LR 82–1233, LR 82–1229, LR 82–1228, LR 82–1224 and LR 82–1226.

Adv. No. 86–244.

United States Bankruptcy Court, E.D. Arkansas, W.D.

April 27, 1987.

Thomas H. McClain, Charles D. Davidson, Davidson Law Firm, Ltd., Little Rock, Ark., for plaintiff.

Richard F. Mitchell, Michael N. Wilcove, Tax Div., Dept. of Justice, Washington, D.C., for defendant.

MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING FINAL JUDGMENT DENYING PLAINTIFF'S OBJECTIONS TO THE ALLOWANCE OF DEFENDANT'S CLAIMS

DENNIS J. STEWART, Chief Judge.

The plaintiff trustee in bankruptcy objects to the allowance of the various claims of the Internal Revenue Service against the above referenced bankruptcy estates. The processing of the objections in extensive pretrial and the trial of them by the bankruptcy court was characterized by a troubled procedural history. It was the intention of the court, an intention which was attempted to be effected by appropriate pretrial orders, that the extensive documentation which was certain to be adduced in support of the objections be made the subject of summaries within the contemplation of Rule 1006 of the Federal Rules of Evidence. It is the announced purpose of that rule, and it was the purpose of this court in invoking the rule, to simplify the evidence before the court and to reduce the volumes of evidence which the court must review before handing down its findings of fact and conclusions of law. "Rule 1006 is based on the common-law rule that a party may prove the contents of voluminous writings which cannot be examined in court without causing inconvenience and waste of time by presenting evidence of their contents in the form of ... written ... summaries ..." 5 Weinstein's Evidence para. 1006(01), pp. 1006-2, 1006-3 (1983). "The admission of summaries of voluminous books, records, or documents offers *the only practicable means* of making their contents available to judge and jury." *Id.*, p. 1006-2 (Emphasis added.). The method of summarization utilized in this action has delayed trial and decision, rather than promoted it. If summarization had been properly attempted and carried out, the action could have proceeded to trial on a set of summaries whereby the *contents* of the voluminous documents were refined and placed in juxtaposition to the principal legal decisions which would control the allowance or disallowance of the claims. If that optimum method of summarization had been followed—and the evidence which has been adduced fails to show any reason why it could not have been—then the court could have determined the amounts of each claim which were to be allowed simply by reference to the summary which related to each legal problem.[1]

■ Further, under the circumstances of this case, it would have seemed advisable for the parties, in briefing the issue of sufficiency of the evidence and that of burden of proof, to summarize the evidence to which they were referring, rather than simply citing the authorities in a virtual vacuum as to their applications. This certainly would have foreshortened the process in which the court has had to involve itself since the conclusion of the trial of the issues in this proceeding. With little hope of making findings of fact which would be at once complete and yet restricted to the material issues, the court has taken it upon itself to wade through the virtual cascade of evidence which the parties insisted on adducing *in addition to* the summaries. Yet, the entire purpose of the presentation of summaries under Rule 1006 is frustrated when the underlying documents, as well

---

1. As is pointed out in the further text of this memorandum, the evidence of the trustee failed to be sufficient precisely for failure to produce it in accordance with the statutory and decisional law which regulated the sufficiency of evidence.

as the summaries, are offered in evidence. "(W)e construe the rule as treating summaries as evidence under circumstances where, in the court's discretion, examination of the underlying documents in a trial setting cannot be done conveniently." *United States v. Smyth*, 556 F.2d 1179, 1184 (5th Cir.1977), cert. denied, 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977). "Whether or not the originals are introduced at the trial, the summaries may be relied upon as evidence-in-chief." 5 Weinstein's Evidence para. 1006(02), p. 1006–6 (1983).

Not to follow the rules which have been fixed by the Congress and the court system is to invite the result which has come to pass in this proceeding. Congeries of evidence were placed before the court and it became the office of the court to sift through the voluminous evidence before it to see if, perchance, any of the items involved gave rise to legal propositions briefed by the parties—or, more importantly, which of the legal propositions and principles advanced by the parties was applicable to the particular item of evidence. Needless to say, the process has consumed a considerable portion of the court's time since the conclusion of the trial several months ago. The parties may be dissatisfied with the delay which has ensued, but the court can only say that the manner in which the case was presented to it more than justifies the delay.

*Burden of Proof and Sufficiency of the Evidence offered in Support of the Trustee's Objections to the claims*

The trustee, in support of his several objections to the claims of the Internal Revenue Service, has offered a considerable body of evidence in the form of the testimony of David R. Kane, a debtor and also a principal or "insider" in the other cases, which seeks according to its tenor to supplement certain documents and thereby qualify them to be treated as deductions under the Internal Revenue Code. In the same category, generally speaking, falls the evidence submitted through the testimony of the accountant who reviewed the corporate records for the trustee and who seeks to embellish certain of the entries in those records in order to qualify for deductions under the Internal Revenue Code.

In the further treatment of this subject below, the court will make more precise findings respecting the credibility and probative value of this testimony. At the outset, however, it seems to be the position of the trustee that the court is foreclosed from making any finding as to the credibility of this evidence; that the evidence adduced constitutes "some evidence" in support of the objection to the claim; that "some evidence" is all that is necessary to rebut the prima facie evidentiary effect of the proofs of claim; that it then devolves upon the claimant Internal Revenue Service to prove its claim by a preponderance of evidence; and that the testimonial evidence above adverted to is uncontradicted. As the trustee states in his "reply brief" filed December 1, 1986:

"The IRS has done virtually nothing to substantiate its claim to over $1,000,000.00 which would otherwise be available for legitimate creditors. The testimony clearly indicates the erroneous and arbitrary nature of the IRS claims. Even where documentary evidence is somewhat lacking, the testimony by witnesses for the Trustee was credible *and basically unrefuted.* Disallowing deductions because there are no documents establishing the precise amount beyond any reasonable doubt ignores commonly-recognized business practice as well as the fact that proof may be established by credible oral testimony. Rev. Rule 54–195, 1954–1 CB 47."

Little doubt inheres in the proposition that "the allegations of a proof of claim are taken as true. If those allegations set forth all the necessary facts to establish a claim and are not self-contradictory, they prima facie establish the claim." 3 Collier on Bankruptcy para. 502.02, pp. 502–21, 502–22 (15th ed. 1987). It is also true that:

"Should objection be taken, the objector is then called upon to produce evidence and show facts tending to defeat the claim by probative force *equal to that of*

*the allegations of the proofs of claims themselves.* But the ultimate burden of persuasion is always on the claimant ... That proof must be by a preponderance of the evidence and it is for the bankruptcy judge to determine whether or not that has been achieved, with due regard being given to the probative value of the proof of claim itself."

*Id.,* p. 502–22. (Emphasis added.) In determining whether the evidence adduced by a trustee in support of an objection is "equal to the allegations of the proofs of claims themselves," within the meaning of the foregoing passage, it must be observed that the proofs of claims themselves must be based upon credible evidence. See, e.g., 3 Collier on Bankruptcy para. 57.18(6), p. 300 (14th ed. 1977), to the following effect:

"Regarding the weight to be given to testimony of witnesses and other evidence, bankruptcy proceedings follow general principles. Bankruptcy is a peculiarly tempting and fertile ground for the operation of afterthoughts, and the financial impossibility of righting a wrong inflicted on other creditors by the allowance of and distribution on a fraudulent or unjust claim calls for a particularly close scrutiny of the evidence presented. *There is nothing to prevent a bankruptcy court from disallowing a claim on the ground that the evidence produced is unworthy of belief or otherwise insufficient to satisfy the court of the existence of a just claim, even in complete absence of contradictory evidence.* (Emphasis added.)

If the proof of claim itself is to be scrutinized with an eye to credibility, so must the evidence which is adduced by the trustee in support of the objection to allowance of a proof of claim. The "some evidence" which is adduced to support the objection must, in view of these fundamental principles, be credible evidence.[2]

With these principles in mind, the court has attempted to assay the evidence which is before it for the purpose of determining (1) the credibility of the oral testimony and (2) whether that testimony, if not credible, was necessary to establish the deduction from the Internal Revenue Service's claims which is sought by the trustee. In undertaking this review over a period of several months and at the hearing itself, this court has concluded that neither the testimony of David R. Kane nor that of the principal accountant presented in support of the trustee's contentions was credible. The court bases its conclusions not only on the basis of the appearance and demeanor of the respective witnesses, but also upon the fact that Mr. Kane had an obvious interest in the outcome of the litigation and his testimony was frequently conclusionary in character and based upon events far in the past, and sometimes his testimony respecting the purpose or recipient of the payment represented by the check or other document contradicted the letter of that document.[3] The court does not propose to employ the principle of *falsus in unius, falsus in omnibus* in respect of Mr. Kane's testimony, but the considerations stated above are sufficient to cause the court to deny the trustee's objection to the Internal Revenue Service's claim with respect to deductions which are sought to be based in part upon the testimony of Mr.

**2.** The trustee attempts to make much of the fact that the claim of the Internal Revenue Service in a bankruptcy case must be treated significantly differently than an I.R.S. assessment in a nonbankruptcy case. There seems to be very little—if any—difference, however. A claim in a bankruptcy case is accorded a prima facie evidentiary effect, just as the I.R.S. assessment is granted a presumption of correctness. See, e.g., *Matter of Osborn,* 4 B.R. 431, 435 (Bkrtcy. W.D.Mo.1979), affirmed, Civil Action No. 79–CV–0354–W–3–6 (W.D.Mo.1981). It is then incumbent upon the party opposing the government's claim to prove by some evidence, which is credible, that the assessment or claim is not

correct. See, e.g., *Matter of Uneco, Inc.,* 532 F.2d 1204, 1207 (8th Cir.1976) ("In opposing the government's claim (in bankruptcy), the burden was upon the trustee to demonstrate that the advances were bona fide loans and not contributions to capital.") Only when the trustee has produced credible evidence sufficient to establish the error, if uncontradicted, does the burden of persuasion shift back to the Internal Revenue Service.

**3.** See notes which characterize the types of proof, *infra*

Kane.[4] The attempt to convert documentation which, on its face, is of a neutral character into deductions from the Internal Revenue Service's legitimate claims is one which calls for the close scrutiny which is mentioned in the authorities quoted above. If this court were to rule that such deductions were proper on the basis of the character of the evidence adduced in this case, it would revolutionize the law of claiming and granting deductions from taxable income and make it possible for taxpayers to demand credits for deductions on the basis of inconclusive documentation and unsupported by any credible testimony. This court recognizes that application of these principles requires the allowance of sizeable claims against the estate, but the applicable law requires that a fair and conscientious determination of the issues at bar be made. The issue of credibility is uniquely for the trial court. In cases such as that at bar, when "the witnesses ... ha(ve) a strong personal interest" and "(t)he Bankruptcy Court ... explicitly state(s) its reasons for (not) believing them," it has been held that "(t)he deference owed by appellate courts to finders of fact is at its highest." *In re Windle*, 653 F.2d 328, 331 (8th Cir.1981). So, it is incumbent upon this court to make as honest a determination of credibility as is humanly possible.

■ The same principles apply with nearly equal force to the testimony of the accountant, a witness who had historically held a position of assisting the debtor organizations [5] and whose testimony was almost always based upon a kind of "educated guess" derives from a purported general knowledge of "what was going on" at the time in question rather than any actual knowledge or memory of the matters respecting which he testified.[6] The appearance and demeanor of this witness, accord-

ingly, was halting and uncertain and did not permit this court, sitting as a trier of fact, to make any finding that any of it was credible. Accordingly, with respect to those contended-for deductions which depend for their characterization as such upon the testimony of the accountant, they must be denied.

The declination of the court to accredit the testimony of Mr. Kane and that of the trustee's accountant necessitates the denial of the trustee's contentions in all respects, except such as may have been voluntarily agreed to by the Internal Revenue Service. Otherwise, even the uncontradicted testimony of the accountant is not sufficient to sustain the trustee's objections. "The uncontradicted testimony of an expert witness is not conclusive and may be rejected by the trial judge if he finds it to be unconvincing." *Petro-Chem Marketing v. United States*, 602 F.2d 959, 961, 221 Ct.Cl. 211 (1979). And, in respect of all other contentions, they must, for the reasons stated below, find their evidentiary basis either in the testimony of Mr. Kane or that of the accountant.

*"Timing Differences"*

(a) *Brokerage fee income*

■ The trustee, under this heading, complains that he has acquiesced in certain increases in brokerage fee income with respect to several of the debtor corporations in the years 1977, 1978, 1979, and 1980. He presents the testimony of the accountant to the effect that, as he contends in his posttrial brief, "portions of this income were actually reported in later years." If this were so, it would follow that deductions ought to be allowed for income twice reported. It is readily observable, however, that the accountant has testified to the reporting of wholly different amounts

---

**4.** The obvious interest which Mr. Kane has in the outcome of this matter and his appearance and demeanor as a witness are nevertheless general matters of qualification which the court may consider on each and every item of his testimony.

**5.** The accountant witness, Dennis G. Cooper testified that he worked as an accountant for Baird, Kurtz and Dobson; that, in such capaci-

ty, he had participated in preparing the tax returns of some of the debtor entities in "1978 through 1980" (tr. 29); and he was unfamiliar with the preparation of many of the returns. See tr. 31. He has served as an accountant for the trustee in 1982 and 1983 and subsequently with respect to these debtor entities.

**6.** See notes which describe the testimony of the accountant, *infra*.

in later years.[7] And there is nothing to support his naked—and admittedly unknowledgeable—supposition that somehow the later-reported amounts include the amounts previously attributed to prior years. Further, as the Internal Revenue Service has pointed out in its brief,

"(t)he accountant's evidence was derivative and inconclusive. Moreover, it was at times contradictory. Note that the corporate trial balances themselves referred to 'management fee' income, not brokerage income, which is an altogether separate type of income."

The transcript of the hearing evidences the accuracy of the government's contention in this regard.[8] The trustee has riposted to the effect that "(t)he testimony by the CPA is uncontroverted." But, even so, in accordance with the authorities and principles cited above, the court must find that it is not sufficient to sustain the deduction.

### (b) Uncollected brokerage fee income as bad debts

■ The trustee next asserts that he should have the right to deduct uncollected brokerage fee income as bad debts when the Internal Revenue Service has previously required that all brokerage fees be reported as income at the time they are earned—regardless of whether they are then collected. The trustee contends that "(n)o taxpayer should be required to pay taxes on income that it can never collect. That is especially true in this case where there are deserving creditors who have had to wait patiently in line while the blatantly

---

7. The following brokerage fee adjustments were agreed to by the trustee:

| Entity | Year | Amount |
| --- | --- | --- |
| DFSI | 1977 | $ 45,716 |
| DFS America | 1977 | 267,427 |
| Realty Consultants | 1980 | 89,250 |
| STC | 1978 | 377,359 |
| STC | 1979 | 53,686 |
| STC | 1980 | 91,680 |
| | Total | $925,118 |

The amounts now sought to be excluded from income are as follows:

| Entity | Year | Amount |
| --- | --- | --- |
| STC | 1977 | $ 13,390 |
| STC | 1978 | 81,046 |
| STC | 1979 | 60,645 |
| | | 35,767 |
| STC | 1980 | 39,850 |
| | | 49,991 |
| | | 23,772 |
| STM | 1981 | 7,240 |
| | | 22,313 |
| | | 31,535 |
| | | 10,157 |
| | | 35,518 |
| STM | 1982 | 3,757 |
| | | 32,131 |
| | | 10,192 |
| | | 19,772 |
| Total | | $477,676 |

8. The testimony of the accountant Dennis G. Cooper amounted in this regard to a prime example of simply finding some pieces of paper which *may* evidence a deduction and then representing to the court that they do in fact represent such a deduction. Thus, the accountant, in support of the trustee's contention that broker-

age income was later reported, pointed to some records which were labeled "management fees" and stated that it was his "understanding"—the basis for which was never satisfactorily elaborated—that the "management fees" were actually brokerage income. See Tr. 322–3 to the following effect:

"Q. (by trustee's counsel) Why is the—on the DFS trial balance, if these are brokerage fees, they are listed here as management fees and accounting and legal?
A. It's just these two numbers we are working with, mainly. You know, It is just a misclassification. This is what the client's general ledger had as a title, whatever. But it is actually commissions that they received off of the partnership units.
MR. MITCHELL: Let the record reflect when you indicate just now that you are reflecting this portion of the trial balance reading 'management fees.'
THE WITNESS: Correct.
"BY MR. MITCHELL:
Q. So that, it is your understanding that these were management fees although, in fact, it is you—I'm sorry. It is your understanding that the client was calling them management fees, although your more recent understanding is that they were more properly called brokerage receipts rather than management receipts?
A. Well, the brokerage fee income—
THE COURT: Just answer his question right now.
THE WITNESS: Yes.
BY MR. MITCHELL:
Q. And your work on this, as you have been back through to try to put this back together is basically an effort of study on your part. You weren't involved at the time, you are just still trying to piece this together later?
A. Correct."

unjustified claims of the IRS remain alive." Again, however, to prove the essential ingredient of uncollectibility, the trustee relies upon the conclusionary testimony of the accountant. The trustee states that the "(u)ncontradicted testimony is that the income will never be collected ... The IRS offered absolutely no evidence that the debts were collectible. The IRS did nothing to impeach the credibility of the Trustee's witnesses on this point." Nevertheless, in accordance with the foregoing principles, it must be mentioned that, "the opinion of a(n) ... expert is entitled to no more weight than is warranted by his individual knowledge, expertise, and reasons." Manual for Complex Litigation, Fifth Ed., section 3.40, pp. 139–140 (1982). In respect of this issue, the accountant really gave no substantial reasons for his conclusions, nor was his testimony such that the court could discern whether he had the knowledge which would be necessary as a basis for a well-founded opinion.[9] This court therefore necessarily concludes that the trustee has not adduced sufficient evidence in this regard to establish the uncollectibility of the brokerage fees.[10]

### Income Reported under the Rule of 78's

■ Prior to the hearing held in this proceeding, the Internal Revenue Service disallowed some $70,501 in interest deductions because those interest deductions were calculated under the Rule of 78's,

which the Service disallowed, under certain circumstances, in Revenue Ruling 83–84. The trustee agreed to the disallowances. But he now points out that the necessary concomitant of use of the Rule of 78's method of interest calculation was that, not only was more interest reported on income tax returns in the early years of a loan term, the corporation would also report more income than normal in those years. The trustee contends that a total of $799,270 in "artificial" income was reported by debtor entities in the years 1978, 1979, 1980, and 1981. But there is really no evidence to establish that, as a fact, as much artificial income was reported beyond the suppositions of the accountant who was produced to testify on the subject.[11] As the Internal Revenue Service has pointed out in its posttrial brief:

"(T)he trustee failed to establish that the corporations did in fact include this artificial income in their returns. The evidence presented on this point was derivative, secondary and unpersuasive. No corporate official or return preparer explained the manner in which corporate returns were prepared. There is no evidentiary basis to sustain the plaintiff's claim here."

### "Management Fee Income"

■ The Internal Revenue Service, with respect to some of the debtor entities, for the years 1978, 1979, and 1980, assessed a total of $141,524 as partnership income

---

**9.** See the testimony at tr. 481 of the accountant Dennis G. Cooper where he states that he does not know the year when these "bad debts" first became uncollectible. "This court .. placed the burden on the taxpayer to prove the year when the debt became worthless." *James Petroleum Corp. v. C.I.R.,* 331 F.2d 344, 345 (10th Cir.1964). The trustee argues that, with respect to the "loans" to related entities, the date of the within bankruptcy was an event which proves uncollectibility. But he has not borne the burden of proving those loans to be bona fide loans. This is particularly so in light of the principle that "(a)dvances between a parent corporation and a subsidiary or other affiliate are subject to particular scrutiny 'because the control element suggests the opportunity to contrive a fictional debt.'" *Matter of Uneco, Inc.,* 532 F.2d 1204, 1207 (8th Cir.1976).

**10.** See note 9, *supra*. And, as the Government has pertinently observed on page 21 of its post-

trial brief: "The obligee's insolvency is certainly no evidence that the obligors cannot pay their debts; moreover, these bankruptcies were filed in late 1982—that is, during fiscal year 1983. Why were the debts worthless? What steps did the corporations or the trustee take to collect these debts? When did the trustee choose to abandon these claims? Who exactly were the obligors and when did they become insolvent? These are elements of a proper Section 166 deduction and were never shown by the trustee."

**11.** The Government, in its posttrial brief, states that it is willing to allow up to $70,501 it it has been proven that this amount, or any part thereof, had already been taxed once. But the evidence adduced is insufficient to demonstrate any amount of "artificial" income.

based upon the taxpayer corporation's receiving a partnership unit, in return for its services, without having to pay the same price paid by other investors. This was done in reliance upon Treasury Regulation 1.721–1(b)(1), which applicably provides that:

> "to the extent that any of the partners gives up any part of his right to be repaid his contributions (*as distinguished from a share in partnership profits*) in favor of another partner as compensation for services (or in satisfaction of an obligation), section 721 does not apply. The value of an interest in such partnership capital so transferred to a partner as compensation for services constitute income to the partner under section 61." (Emphasis added.)

The trustee, seizing upon the proviso above emphasized, contends that the value given must be regarded as a share in partnership profits and therefore not as income to the partner receiving the value. In the absence of evidence supporting this position, the trustee asks the court to accept this contention as exiomatic because the "corporation's capital ownership percentage is exactly equal to the percentage of capital which it had actually contributed." [12] Again, however, the testimony which supports this assumption is superficial and largely based on assumptions itself.[13] The Internal Revenue Service has presented some evidence that the adjustment is based upon capital contributions and it has not been sufficiently rebutted by the evidence presented by the trustee.[14]

### Internal Revenue Service "Errors"

■■■■■ Again, on the basis of his accountant's uncontradicted testimony, the total capital contributed for the partnership of $719,712.00. Would that be the capital that all the partners contributed?
A. Barring any adjustments, it should be, yes.
Q. Okay
A. And that is the first year, I believe, and all kinds of ifs and ands there but—
Q. Generally speaking?
A. Generally speaking, that is what it is supposed to be.
Q. Okay, now, Interglobal, Inc., has a capital ownership percentage according to its K–1 of .3968, is that correct?
A. That is what it says here.
Q. Okay
A. With a profit and loss rate percentage of five percent.
Q. Okay.
A. I believe that is it.
Q. So, if you apply this .3968 times the total capital contributed, shouldn't that give you the total capital that Interglobal contributed?
A. It should, definitely. But that is by the way .39. .... So, I don't know, you know, whether they've got the right figures on there or not."

---

12. A contribution of capital, in this context, does not necessarily enlarge the contributor's percentage of ownership in the corporation. This is especially so between related entities. Thus, it can be held that, even though an extension of money to a related corporation, does not enlarge the stock holdings of the contributor, the "transaction resembles an equity interest because all the traditional elements of a valid debt are missing." *Rose Hills Memorial Park Association v. United States,* 463 F.2d 425, 431, 199 Ct.Cl. 6 (1972). "(In) the final analysis each case must rest and be decided upon its own unique factual flavor, dissimilar from all others, for the intention to create a debt is a compound of many diverse external elements pointing into the end to what is essentially a subjective conclusion." *American Processing and Sales Co. v. United States,* 371 F.2d 842, 848 (Ct.Cl.1967). These principles would seem particularly to apply in instances of closely-related entities, such as those in this case. Thus, in *Matter of Uneco, Inc.,* 532 F.2d 1204, 1208 (8th Cir.1976), the issue of whether "the purported loans were made in proportion to equity holdings" was said to be only one of ten which were to be considered on whether the extensions of money were to be considered loans or contributions to capital.

13. The manner or "proving" this particular deduction is characteristically that of having the accountant make conjectures from the face of a document which was not shown to contain either correct or pertinent information. See tr. 354 to the following effect:
"BY MR. MCLain:
Q. I show you exhibit sixty-two, and on page four under Schedule M, "B" shows a figure of

14. See the testimony of revenue agent John Caldwell at tr. 350–351, to the effect that "management fee income" "consists of a situation where the general partner received an interest in a partnership for less than the fair market value. Fair market value being determined by the amount the other partners were paying for the same interest. The difference in what they paid and this computed figure has been taken into an income, and called 'management fee.'"

trustee contends that the Internal Revenue Service erred in charging Diversified Financial Services Corporation with $79,180 in brokerage fee income. The trustee contends that the Internal Revenue Service was in error in the following particulars:

"(I)n its computation of Brokerage Fee Income for Diversified Financial Services Corp. of America for the (year) ended 4/30/77, the IRS overstated income earned by $34,680, made a computational error of $29,500 and included $15,000 which had been reported in the prior year. These errors total $79,180."

But it is the duty of the court, even though the testimony was uncontradicted, to determine whether that testimony is sufficient to establish the proposition contended for. This court concludes that the testimony is not sufficient to establish an error in any of the particulars contended by the trustee. As in the above instances, the testimony of the accountant was only derivative and secondary. It was primarily based upon suppositions as to what was done when the tax returns and the documents underlying them were prepared, not what was actually done.[15] And, as the Internal Revenue Service points out in its posttrial brief:

"That sum (of $79,180) consists of three separate items: $34,680 plus $29,500 plus $15,000. Although the trustee attempted to present evidence as to each of these three components, he failed to show any mistake. As to the separate $29,500 item, the trustee's accountant admitted that he had not seen the IRS statutory notice of deficiency with respect to that assessment, Tr. 186–189, so that he could hardly testify that he was unable to locate the source of the assessment; if the accountant has not read the official notice as to the basis of the assessments, he is in no position to give evidence as to the merits of the assessment. In view of this faulty evidence, the trustee clearly

has failed to establish any mistake, and the adjustment for $79,180 should be sustained."

Accordingly, this court declines to honor the trustee's contention in this regard.

### Bad Debt and Commission and Sales Expense

 The trustee next contends that certain payments made by and between the debtor entities were loans instead of capital contributions, as they have been characterized by the Internal Revenue Service. The evidentiary support for the contention that the payments of monies were intended as loans rather than capital contributions is the testimony of David R. Kane. As found above, it is neither sufficiently credible nor sufficiently detailed to support the deduction. Without Mr. Kane's testimony, there is no evidence to establish the intention that the payments were intended as loans rather than capital contributions[16] and, for the reasons stated above, that testimony is not regarded by the court as credible.[17] Further, there is insufficient evidence that the debts—if they were such—became worthless as of the time as of which the deduction is sought. "Generally this burden is met by showing that some identifiable event occurred during the course of the year which effectively demonstrates the absence of potential value ... The unsupported opinion of the taxpayer alone that the debt is worthless will not be accepted as proof of worthlessness." *Holland v. C.I.R.*, 728 F.2d 360 (6th Cir.1984). This court, accordingly, denies the trustee's contentions in this regard.

 In this category, the trustee contends that a second category of payment constitutes a lawful deduction under the provisions of section 162, Title 26, United States Code. That is a series of payments to salesmen and commission employ-

---

15. The accountant whom the trustee produced to testify had in fact not seen the Internal Revenue Service's assessment. Therefore, his statement that he could find no basis for it cannot be credited as evidence that it in fact had no basis or that it had an unreasonable basis.

16. See, e.g., tr. 112. The loans were not represented by notes or any indicia of a loan. The only evidence which exists to identify the expenditure as a "bad debt" is the conclusionary testimony of Mr. Kane. See also, Tr. 210, 249, 251, 115, 121–122, 439–440.

17. See note 3, *supra.*

ees which are characterized by him as "salary expense. It is true that salaries paid by a corporate or other taxpayer to its officers or employees may qualify as deductions under section 162(a)(1) of the Internal Revenue Code. "Section 162(a)(1) of the Internal Revenue Code of 1954 permits a taxpayer to deduct as ordinary and necessary business expenses 'a reasonable allowance for salaries or other compensation for personal services actually rendered.'" *Pepsi-Cola Bottling Co. of Salina, Inc. v. C.I.R.*, 528 F.2d 176, 179 (10th Cir.1975). But the trustee asks the court to make such a finding in a vacuum, on the basis of a record which is barren of any showing which is sufficient to establish that any salaries were paid in the years in question which were not previously the subjects of deductions.[18] From the record before the court, it appears that the trustee desires that this court rely on its own prior rulings in which it held that payments made to three former commission salesmen by debtor entities were salaries as opposed to loans. The trustee appears—by necessary implication—to contend that those rulings have a *res judicata* or collateral estoppel effect in this case. Again, however, the successful invocation of those doctrines depends upon their being properly pleaded and proved by their proponent.[19] The facts necessary to bring those doctrines into focus—chiefly those which would demonstrate the applicability of either doctrine when the Internal Revenue Service was not a party to the prior actions—[20] have not been demonstrated. Even if they were, there is no evidence that these salaries are separate and apart from any which may have been previously deducted by the debtor entities.

*Interest Expense*

■ The debtor entities also seek a deduction for interest expense in the sum of $1,639,210.36 allegedly paid on various note repayments. There can be little question that interest payments are deductible. See section 163(a) of the Internal Revenue Code. But, in making the determination, the courts must insist on minimal evidence that the amounts paid were, in reality, interest. In this action, the only evidence which identified the payments sought to be deducted as actual interest payments was the self-serving testimony of David R. Kane, a sample of which is set out in the marginal note.[21] The testimony is particularly inconclusive on any amounts which may have been paid as interest on the notes. On this critical issue, the authorities hold that the trial court is "permitted to discredit self-serving testimony." *Lifschultz v. C.I.R.*, 393 F.2d 232, 234 (2d Cir. 1968). Under the circumstances of this case, the court has no alternative except to discredit the testimony of the witness who testified in favor of this deduction. The courts are not privileged to make awards

---

**18.** See tr. 448 ff. The supporting testimony was simply a series of statements by Mr. Kane that certain persons worked for the debtor organizations and that the checks to them represent payments in the form of commission or salary. Mr. Kane had testified in a former proceeding that the same types of payment structures were loans.

**19.** "Res judicata ... is an affirmative defense ... and the party asserting such a bar bears the burden of showing that it applies." *Davis v. United States Steel Supply*, 688 F.2d 166, 170 (3d Cir.1982)

**20.** "For res judicata to apply there must be a showing that 'between the previous action and the present action there (is) an identity in the thing sued on, identity of the cause of action, identity of the persons and parties to the action, and identity of the quality or capacity of the

parties suing or sued.'" *Davis v. United States Steel Supply*, 688 F.2d 166, 170 (3d Cir.1982). Collateral estoppel, similarly, requires some privity between the parties in the former litigation. See 1B Moore's Federal Practice para. 0.441(3.–2), p. 731 (1984).

**21.** See Tr. 510 ff., where it was Mr. Kane's testimony that checks written to Bailey Mortgage Company and Mississippi Hotel Company were for interest; that there were no supporting documents allocating principal and interest (tr. 512); there was no promissory note (tr. 513); and that all that was available to show the allocation between principal and interest were "internal work papers prepared by the company" which constituted inadmissible hearsay. (Tr. 514.).

on the basis of guesswork and speculation.[22]

■ It appears to be the position of the trustee that the court must—or may—infer from the fact that the Internal Revenue Service has granted some interest deductions that those which are now asserted are equally meritorious. "In the Amended Answer," the trustee states in his "post trial memorandum of law," "the IRS accepted $950.410 of the interest deductions. Acceptance of such a large figure highlights the fact that the IRS adjustment was arbitrary and without justification." This court believes the consideration to be irrelevant, particularly in the absence of reliable evidence as to the amounts which are now sought to be deducted. The court has no doubt that some interest deductions were proper, but it cannot make a reasonable judgment as to the amount on such speculative evidence as is adduced in this case.

It can hardly be said, for the same reasons, that the position of the Internal Revenue Service has been arbitrary. The Internal Revenue Service, in fact, has acceded to more of the interest deduction during the course of these proceedings.[23] But, with respect to the other claims for interest deductions, the Internal Revenue Service aptly states as follows in its posttrial brief:

"There now remains only $519,762 in dispute ... This balance of $519,762 must be disallowed, for lack of substantiation. The trustee provided no probative support or evidence in support of these deductions. As to two of them (Realty Properties for $270,726 and Summa T International for $14,670) his only reference was at Exhibit 20v, the bare summary of the interest deduction. No evidence of debt or payment or allocation to interest was shown.

"The evidence on the Summit item of $226,000 was slight. Exhibit 21b summarized six payments totaling $134,-876.24 (the balance of some $90,000 was not identified), but there is no evidence of a note, nor any evidence that these were payments of interest; if a debt existed, interim payments could reduce principal as well as pay interest. Mr. Kane identified the transaction, but was not permitted to describe the substance of the transaction (without the underlying documents), Tr. 510–511.

"The Interglobal claim of $8364 is supported by a series of multi-party checks, Ex. 21q, and by Mr. Kane's explanation, but that explanation was quite contorted, and Mr. Kane did not have the notes, and he could not allocate the payments between principal and interest. Tr. 518–520.

"Clearly the trustee's proof in support of these disputed interest deductions is negligible. In order to sustain these deductions, the trustee should have shown (a) proof of the debt, (b) payment of the interest on that debt, and (c) some contemporaneous allocation of payments between interest and principal; he at least should have put forward evidence so that the Court could clearly have determined the appropriate interest deduction."

This court accordingly denies the trustee's claim of deductions in this regard.[24]

### Professional fees

■ Additional deductions are sought with respect to professional fees allegedly rendered for the benefit of the debtor entities. Again, the evidence of deductibility is sparse. As the trustee states in his posttrial brief, "(t)he deductions for professional fees are based upon checks which have been written to non-related third parties." But it is not established that these were ordinary and necessary expenses incurred in carrying on its trade or business. See *E.I. duPont de Nemours and Company v. United States*, 432 F.2d 1052, 1059 (3d Cir.1970) ("(T)he burden was on the taxpay-

---

**22.** See pages 405, 405, and 406 of the text of this memorandum, *infra.*

**23.** See page 44 of the Government brief: "The Government has now agreed that the trustee has substantiated $950,410 in interest for FY 1982. There now remains only $519,762 in dispute."

**24.** Because the Government has voluntarily conceded some of the interest, see note 23, *supra,* the court presumes that it need not enter a judgment to that effect.

er to show that these were 'ordinary and necessary expenses' incurred 'in carrying on (its) trade or business.' ") The testimony of the witness Kane in support of this deduction was simply not sufficient to establish that the professional fees were ordinary and necessary business expenses,[25] and was, in accordance with the above general considerations,[26] not credible generally. This claim of deduction is therefore denied.

### Travel and Entertainment

■ Again, the sparse evidence before the court is simply the checks purporting to have been written for legitimate travel and entertainment expenses, none of which contains a memorandum or any notation made of the purpose of the expenditure. Rather, the brief and conclusionary testimony of the witness David R. Kane are relied upon to establish the nature of the expenditures evidenced by the checks. The checks do not, as the trustee suggests, show on their face that the expenditures were for deductible travel and entertainment. It was incumbent upon the proponent of the objection to demonstrate by documentation and credible testimony the legitimate business purpose of the deductions. He had "the burden of proving the validity of his Section 162 deductions for ... travel expenses." *Coussement v. C.I.R.*, 391 F.2d 227, 229 (6th Cir.1968). This he attempted to do through the checks, supplemented only by the very brief testimony of Mr. Kane, which, for the foregoing reasons, was neither sufficient

nor credible. The court accordingly denies the trustee's claims for deductions in this regard.

### Adjustments to tax liabilities of real estate partnerships

■ The trustee next attacks the action taken by the Internal Revenue Service in disallowing all deductions claimed by certain "real estate partnerships" related to the debtors on the grounds that the organizations were sham organizations having no substance. The action taken by the Internal Revenue Service was based on Tax Court determinations that at least some of the organizations were without organizational substance.[27] It is clear from the contentions made by the Internal Revenue Service that the action taken by it with respect to entities not involved in the Tax Court adjudications is based on a contention that those entities, similarly to the entities in the Tax Court cases, are unsubstantial, sham entities.[28] The trustee, in challenging the Internal Revenue Service's contention, has elected not to put on any significant, credible evidence of the substance of the real estate partnerships. Mr. Kane only states a general and conclusionary testimonial contention that the organizations are real, not sham—evidence which is wholly insufficient to establish the contrary of the Internal Revenue Service's bases for their action, and, further, not creditable as self-serving and biased, as explained above.[29]

---

**25.** As the Government points out in its brief: "Numerous deductions were taken for commissions paid to sales personnel or for professional expenses. However, the Trustee totally failed to show that the expenses were incurred in a trade or business. Rather, for an overwhelming number of these expenses, the evidence is that the expenses were incurred in the course of looking for investments, acquiring properties for syndication of partnership interests or in selling partnership interests." Further, without adequate written documentation, the only testimony which can conceivably be relied upon to establish connection with the trade or business is the unreliable testimony of David R. Kane. The court cannot, without more, allow the deductions on the basis of such a showing. See pp.

393, 394, and 395 of the text of this memorandum, *supra.*

**26.** See notes 5, and 25, *supra.*

**27.** See page 50 of the Government's posttrial brief to the effect that: "Mr. Kane ran a naked tax shelter enterprise, where three other Courts (in *Wofford, Backus* and *The Grand,* all previously cited) have earlier ruled against the form or substance of the Kane enterprises, and ... the evidence in this Court has shown few if any corporate controls or standards for cash expenditures."

**28.** See note 27, *supra.*

**29.** See note 3, *supra.*

██ The trustee, however, contends that it is not he who bears the burden of demonstrating that the organizations have substance, but rather the Internal Revenue Service which has the burden of proving the basis of its action before he is required to go ahead with the production of evidence. The trustee relies on cases which hold that, when the action of the Internal Revenue Service is without any reasonable explanation, the burden of initially producing evidence is shifted to as to devolve upon the Internal Revenue Service. See *Llorente v. C.I.R.*, 649 F.2d 152, 156 (2d Cir.1981), to the following effect:

"A statutory notice of deficiency based on unreported illegal income is initially entitled to a presumption of correctness ... However, that presumption is only as strong as its rational underpinnings. Where it lacks a rational basis the presumption evaporates. Otherwise the Commissioner could, merely by arbitrarily issuing a naked assessment, place upon the taxpayer the unfair, and at times impossible, burden of proving a negative ..."

See also *Weimerskirch v. C.I.R.*, 596 F.2d 358, 360 (9th Cir.1979), to the effect that the Internal Revenue Service cannot lawfully rely upon 'a "naked" assessment without any foundation whatsoever.' "

But, in this case, the action of the Internal Revenue Service is reasonably explained. It is clearly contended that the organizations were not genuine for the same reasons as are stated in the Tax Court adjudications. It was clear to the trustee, therefore, what evidence he would have to produce in order to rebut the presumption of correctness of the Internal Revenue Service's claim or adjustment—it was necessary to produce, in accordance with the general principles stated at the beginning of this memorandum, some *credible* evidence of the genuineness of the organizations. Having failed to produce such evidence, the trustee must be held to have failed to carry his burden of rebutting the presumption in favor of the claimant's action.

30. See Tr. 146–154.

### Campbell Management Corporation's net operating loss

██ The trustee contends in his posttrial briefs that "Campbell Management Corp. had certain net operating losses from years prior to its consolidation with the Debtors. That NOL can be carried forward 15 years to offset against other income. Internal Revenue Code section 172.-" Again, however, the problem has been that of adducing such evidence as will bring about an entitlement to the deduction. In its posttrial brief, the Government has accurately analyzed the situation with respect to this issue as follows:

"For the Summa T Mortgage return for 1981 (Exhibit 76, worksheet 20), the trustee claims a net operating loss for Campbell Management, in the amount of $31,285. The trustee pointed out that this NOL carry-forward claim had not been made on the original return, and had only recently been discovered, Tr. 431–434, but did not offer any separate evidence of the loss. This deduction, like all other deductions, must be proven. Merely making the announcement of a claim—as the trustee has done here—is no more probative than filing a pleading. No evidence was presented, disclosed, or summarized, so that this claimed deduction is without merit."

This court therefore accordingly denies the trustee's assertion in this regard.

### Scranton Coal Partnership

██ The same is true of the trustee's allegations that the Internal Revenue Service is taxing "phantom" income in making its assessments against that entity. The Government has adduced evidence to support its position.[30] The trustee, aside from speculations of witnesses and counsel, has failed to adduce sufficient and credible evidence to rebut the Internal Revenue Service's *prima facie* case.

### Other matters

The manner in which the evidence has been presented in this case and in which

the briefing has been accomplished has even left the court in considerable doubt as to what claims and defenses were still being prosecuted and asserted as of the time it was submitted for decision.

■ Among the uncertainties now faced by the court is the question of whether the Internal Revenue Service is still resisting all of the trustee's assertions that certain "mistakes" were made by the Internal Revenue Service. The trustee, in his initial posttrial brief, asserted four such "mistakes." As has been observed above, on page 12 of this memorandum, the Internal Revenue Service opposed one of these allegations of "mistake" and this court has held in its favor in that instance.

The Internal Revenue Service does not, however, appear to oppose the following additional assertions of "mistake":

"Second, for Summa T Corp., Int'l. for year ended 6/30/80, the IRS made an adjustment to Management Fee Income of $19,507. There was nothing in this adjustment to detail how it was computed and the CPA's for the Trustee have been unable to find any support for the adjustment.

"Third, for IEI Realty for year ended 6/30/77, the IRS made an adjustment to guaranteed payments income of $82,000. This amount was actually reported in 1978 ($50,694) and 1979 ($31,306). Since it was reported in other years, the IRS adjustment is clearly in error.

"Fourth, for Summa T. Mortgage, year ended 3/31/81, the IRS made an adjustment to Management Fee Expense of $28,452. There was nothing in the adjustment to detail how it had been computed and the CPA's for the Trustee have been unable to find any support for the adjustment."

Nevertheless, this court cannot find from its review of the record before it that the Internal Revenue Service has conceded those issues. Therefore, the court proposes to rule on the merits of these issues insofar as the record before it will permit. The assertions of error appear to have been made much like the other assertions of deduction—on the basis of suppositions made by the officers of the estate in viewing the records in retrospect. The trustee did not produce the preparer of the returns to demonstrate that the adjustments constituted the same amounts as were reported and taxed in other years. Nor was there evidence of any error in the other respects mentioned. The court, therefore, denies these assertions of the trustee.

■ Another matter respecting which the parties' positions appear to be uncertain is that of the claimed deduction for "abandoned project expense." The court cannot find that the trustee has briefed this issue in his posttrial briefs. The Government opposes allowance of the deduction on the familiar ground of absence of sufficient evidence. This court agrees with the Government's position. The only evidence which connected the checks, which were written to a variety of persons, with any abandoned projects or with the trade and business of the debtor entities is the unreliable testimony of Mr. Kane, which this court has elected not to believe. It is simply too fertile a field for the practice of fraud for the court to find in accordance with naked and conclusionary testimony that certain expenditures, which on their face had nothing to do with the projects, really were connected expenditures. Further, to find that they were expenditures which were connected with the ordinary trade or business of the debtor entities is another step removed, a further inference which the court cannot in good conscience make.

And so, as it seems to the court, for failure to abide the pretrial orders and instructions of the court, the trustee has been unable to meet the burden of proving his entitlement to the deductions. It seems unlikely in retrospect that, had the evidence been summarized as suggested by the court, under the headings of the relevant and controlling legal propositions, there could have been the failure of proof on this wide and catastrophic of a scale. For, then, the trustee would have had to match his proof against the letter of the statutes and the case decisions thereunder. Such proof as was required, if it existed,

could have been marshalled and appropriately summarized. If it was discovered not to exist, the issue could have been dropped. All concerned would have been saved a monumental portion of time and effort.

As an example of what has happened in this action, the presentation of the evidence on travel and entertainment expenses might be mentioned. Such evidence as was presented seems to have been presented in total obliviousness of the rather strict types of proof required by the governing case law and the rules of the Internal Revenue Service. See, e.g., *Hughes v. C.I.R.*, 451 F.2d 975, 976, 977 (2nd Cir.1971), to the following effect:

"Section 274 of the Code disallows business entertainment expenses altogether 'unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statements (A) the amount of such expenses ... (B) the time and place of the ... entertainment ... (C) the business purpose of the expense ..., and (D) the business relationship to the taxpayer of persons entertained ...

"The Treasury Regulations pursuant to section 274 state that 'adequate records' are 'an account book, diary, statement of expense or similar record ... and documentary evidence ... which, in combination, are sufficient to establish each element of an expenditure ...' section 1.274–5(c)(2). The Regulations continue that if the taxpayer fails to meet the adequate records requirement, he must establish each element of the expenditure:

(i) By his own statement in writing containing specific information in detail as to each element; and

(ii) By other corroborative evidence sufficient to establish such element. If such element is the ... cost, time, place or date of an expenditure, the corroborative evidence shall be direct evidence, such as a statement in writing or the oral testimony of persons entertained or other witnesses setting forth detailed information about such element....

Treas.Reg. Section 1.274–5(c)(3).

"Finally, according to the applicable legislative history, 'sufficient corroborative evidence,' relative at least to the amount of the expense, means 'oral testimony of the taxpayer plus more specific evidence.' "

Yet, the trustee, in his posttrial brief, contended that certain checks, on their face, should be sufficient to establish entitlement to the deductions. See page 15 of the "post trial memorandum of law" filed October 16, 1986, to the effect that, "(f)rom the face of the check summaries themselves, these items should properly be deductible." No authority was cited for that proposition. Later, in the reply brief filed by the trustee in December of 1986, the trustee stated that "the Court may lessen the degree of exactitude required for substantiation if the circumstances so warrant. *Cohan v. Commissioner of Internal Revenue*, 39 F.2d 540 (2nd Cir.1930)." But a brief attention to the later decisions would have revealed that this is no longer good law. "*Cohan v. Commissioner of Internal Revenue*, 39 F.2d 540 (2d Cir.1930), first enunciated the rule that if a taxpayer could prove that he had incurred travel or entertainment expense of an inexact amount, the Revenue Service must make 'as close an approximation as it can' of the amount spent, since 'to allow nothing at all appears ... inconsistent with saying that something was spent.' 39 F.2d at 544. The *Cohan* doctrine gave rise to such extensive expense account abuses that Congress in the Revenue Act of 1962 expressly rejected it, holding taxpayers to considerably more rigid requirements vis-a-vis the proof of substantiation of business entertainment and related expenses." *Hughes v. C.I.R.*, *supra*, at 976. See also *Berkley Mach. Works & Foundry Co. v. C.I.R.*, 623 F.2d 898, 902 (4th Cir.1980) ("The substantiation requirements of section 274(d) were intended to abolish the *Cohan* rule and require the taxpayer to prove the exact amount and circumstances of the deduction; otherwise it would be disallowed entirely.") Thus, it seems that only a sciolistic attention to the cases which govern the submission of proof would have saved a great measure of time and effort.

In other respects, it may be true that the trustee's claim could rise no higher than the credibility of the witnesses who supported those claims. But it seems to have been a blueprint for failure to have selected only an accountant to make a speculative and *post hoc* review of the records and prior returns and a debtor whose interest in the outcome of the proceedings was painfully obvious. The court predicates its holding with respect to these issues on the absence of credibility of the trustee's witnesses. All the trustee's asserted claims are accordingly denied. A final order will issue with even date herewith so directing.