Steven **GENTILE** and William Rydstrom, Plaintiffs,

v.

The **COUNTY OF SUFFOLK**, a municipal entity, Detective Robert Sisino, Detective Clifford Christ, Police Officer Michael Rogers, Police Officer Allen Prim, Police Officers John Does, individually and in their official capacities, Defendants.

No. CV–87–2359.

United States District Court, E.D. New York.

Feb. 15, 1990.

See also, D.C., 711 F.Supp. 724.

Jonathan C. Moore, James I. Meyerson, New York City, for plaintiffs.

E. Thomas Boyle, Suffolk Co. Atty. by Charles P. Kelly, Suffolk County Attorney's Office, Hauppauge, N.Y., for defendants.

MEMORANDUM AND ORDER

WEINSTEIN, District Judge:

TABLE OF CONTENTS

I.   INTRODUCTION

II.  FACTS

   A.  *Fracas with Police*

   B.  *Immediate Aftermath*

   C.  *State Prosecutions*

   D.  *Post–Trial Trustworthiness Hearing*

III. STATE INVESTIGATION COMMISSION REPORT

IV.  RELEVANCE (RULES 401–402)

V.   HEARSAY (RULE 803(8))

   A.  *Public Reports Generally*

   B.  *Assumption of Reliability*

   C.  *Criteria of Trustworthiness*

     1.  Timeliness

     2.  Special Skill or Expertise

     3.  Due Process in Hearings

      (a) Contradictory Evidence

      (b) Procedural Safeguards

      (c) SIC's Legislative Mandate

     4.  Motivation

     5.  Finality of Findings

     6.  Conclusion

   D.  *Other Factors* (Rules 102, 104(a), 608(a), 611(a), 803(24), 1006)

1. Ability of Jury to Assess Accuracy
2. Trial Time Saving

VI. PREJUDICE (RULE 403)

IX. CONCLUSION

## I. INTRODUCTION

Is a government report finding widespread police and prosecutorial misconduct admissible in a section 1983 case brought against a municipality? Yes, in this case.

Plaintiffs bring state and federal claims charging that their constitutional and civil rights were violated by four individual defendants acting in their official capacities as police officers and by the County of Suffolk. A jury found both the individual defendants and the County liable for malicious prosecution under both state and federal law. Damages totalling $300,000 were assessed against the County. No monetary damages were assessed against the individual defendants.

Defendants now move for judgment notwithstanding the verdict pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. Their motion is based in large part on the court's decision to admit portions of a government report issued by the Temporary Commission of Investigation of the State of New York (SIC or Commission) shortly before the trial. The Commission found the Suffolk County Police Department and District Attorney's Office responsible for numerous incidents of employee misconduct that occurred in both offices over the better part of the 1980's.

Plaintiffs' request to admit the entire 199-page SIC report was denied. Instead each side was allowed to select brief portions to be read to the jury. In its detailed limiting instructions to the jury the court emphasized that the excerpts from the report were to be viewed with caution and considered only with regard to the case against the municipal defendant provided the jury first found that the individual defendants had violated plaintiffs' constitutional rights. The following "factual findings" of the SIC were read to the jury:

1) Despite over a decade of warnings in the form of court decisions and grand jury and bar association reports, both the Police Department and the District Attorney's Office continued to ignore or to inadequately investigate and punish employee misconduct.

2) One of the findings of the Commission has been the systematic failure of the District Attorney's Office to investigate and take appropriate action where it has uncovered or been informed of misconduct by its own employees and other law enforcement personnel.

3) The Commission has determined that misconduct, improprieties and poor management were characteristic of the oversight and control of police personnel by the Suffolk County Police Department. Problems ranged to the failure in the procedure employed by the Department in the investigation and punishment of police misconduct.

4) The Suffolk County Police Department's behavior with regard to misconduct investigations was neither recent nor due to lack of notice of the shortcomings of the Department's procedures and practices.

5) Earlier reports provided the Department with notice of the need to reform its procedures in misconduct investigations. However, the Department did not take that path.

6) The Commission's investigation of the Suffolk County Police Department and District Attorney's Office was initiated following an October 29, 1985, letter from Suffolk County Court Judge Stuart Namm to Governor Mario M. Cuomo, and Judge Namm's public complaints, which came to the Commission's attention. There were other reasons stated in the report for the investigation besides Judge Namm's complaints.

7) The Commission feels confident that the vast majority of police and prosecutorial personnel in Suffolk are persons of ability, industry and integrity.

The quotations are set out again in context in Part II D, below.

Defendants maintain that no part of the SIC report should have been admitted because neither the report as a whole nor the

"factual findings" introduced were sufficiently trustworthy to be admitted under the hearsay exception contained in Rule 803(8)(C) of the Federal Rules of Evidence. They also argue that the excerpts should have been excluded under Rules 401 and 402 as lacking in relevance or under Rule 403 as unfairly prejudicial.

The court granted defendants' motion for a post-trial hearing on the trustworthiness of the report and designated the Commission a special party for purposes of the hearing. After an extensive evidentiary hearing, briefing and argument, the court denies defendants' motion.

## II. FACTS

### A. Fracas with Police

This civil litigation arose out of a brawl in a diner in the early morning of July 28, 1981. All the participants had been visiting bars—the police after finishing their four to midnight tour. Plaintiffs Gentile and Rydstrom and their fellow loutish female companions harassed the individual defendants with lewd remarks and food throwing. Defendants Sisino, Christ and Rogers and Prim—Suffolk County policemen who were not in uniform—responded with warnings and then force. Plaintiffs testified that none of the defendants identified themselves as policemen. Defendants testified that one of the officers had shown plaintiffs his badge and ordered them to cease their disruptive conduct before the start of the physical altercation.

At some point in the fight officer Rogers' gun fell or was knocked to the ground. Plaintiffs testified—and defendants denied—that after retrieving his gun, Rogers pointed it at Rydstrom's head and threatened to shoot. The fight spilled out of the diner, where plaintiff Gentile picked Officer Sisino's wallet up from the ground, believing it, so he said, to belong to Rydstrom. Sisino's police shield and other police department identification were in the wallet. Sisino claimed that the wallet and identification were stolen from his pocket as he lay on his back outside the diner.

In response to a call made by a waitress, uniformed Suffolk County police arrived on the scene shortly after plaintiffs drove off. Although plaintiffs' car was stopped near the diner, the command officer at the scene, Sergeant Dillworth, allowed plaintiffs to leave. (He apparently had some reservations about his fellow policemen's disclaimer of any blame.) None of the four officers, at least two of whom had been beaten, asked that Gentile and Rydstrom be held for questioning, much less arrested for assault or robbery.

### B. Immediate Aftermath

Gentile and Rydstrom were arrested on July 31, 1981, after Sisino told his superiors that his badge had been stolen. On November 27, 1981, plaintiffs were indicted by a state grand jury on two counts of robbery against Sisino and three counts of assault against Sisino, Christ and Rogers.

Immediately following the incident, and based on initial reports that off-duty police officers had been involved in a fight resulting in the loss of a police shield, the Internal Affairs Division of the Suffolk County Police Department began a departmental investigation. As a result, departmental charges were brought against Sergeant Dillworth, who was charged with neglecting his duty. The Internal Affairs report concluded that Dillworth's "negligence" had prevented him from learning in an expeditious fashion that Sisino, Rogers, Prim and Christ had been the victims of a crime and therefore from immediately arresting Gentile and Rydstrom. The officers actually involved in the fight were not charged with any wrongdoing. Charges against Sergeant Dillworth were later dropped.

### C. State Prosecutions

The judge presiding over the first trial of Gentile and Rydstrom declared a mistrial. The Assistant District Attorney prosecuting the case had insisted, after the trial had commenced, that he would call the judge himself to testify. In 1982 the state trial court dismissed the indictments on the grounds that re-trial was barred by the double jeopardy clause. *See People v. Gentile*, 114 Misc.2d 610, 452 N.Y.S.2d 507 (Sup.Ct.1982). More than a year later, on

August 29, 1983, the Appellate Division, Second Department, reversed and reinstated the indictments. *People v. Gentile*, 96 A.D.2d 950, 466 N.Y.S.2d 405 (2d Dep't 1983). In April 1985 a jury found plaintiff Rydstrom guilty of assault, and plaintiff Gentile guilty of robbery.

The Assistant District Attorney who handled both the first and second trials, Timothy Mazzei, was a close friend of Officer Sisino. After the second trial, Mazzei met and eventually married Sisino's daughter.

In February of 1987 the convictions were reversed and acquittals ordered by the Appellate Division, Second Department, on the grounds that the evidence was "insufficient in quality and quantity to justify the verdict." *People v. Gentile*, 127 A.D.2d 686, 511 N.Y.S.2d 901, 903 (2d Dep't 1987). In particular, the court found the testimony of Officer Sisino regarding the alleged theft of his badge to be "highly questionable and uncorroborated," and sufficiently "inconsistent" with the evidence to have "raise[d] a reasonable doubt as a matter of law as to the defendants' guilt of the crime of robbery." *Id.* Because the count upon which Rydstrom had been convicted was for assault in the course of the commission of a robbery, and thus dependent upon Gentile's robbery conviction, the appellate court also overturned Rydstrom's conviction. *Id.*

In the course of noting that it would have reversed the convictions even without a dismissal of the indictment, the appellate court observed:

> [W]e believe that, in view of the Assistant District Attorney's admittedly close personal relationship with the complainants (he became engaged to Sisino's daughter) and his confessed deep emotional involvement in the case, he should neither have tried this case nor been involved in its course.

*Id.* 511 N.Y.S.2d at 904 (citing Code of Professional Responsibility, EC 7–13, Canon 9; ABA Project on Standards for Criminal Justice, The Prosecution and The Defence Function, Part I [1.2][ (a) ], [ (b) ]).

Following dismissal of the indictments, plaintiffs requested that the Suffolk County Police Commissioner and the Suffolk County District Attorney investigate the defendant police officers for perjury and other offenses. The Chief Law Assistant to the then-Suffolk County District Attorney refused, stating that his office had found no basis for the charges. Captain Hough of the Suffolk County Police Department Internal Affairs Division responded that a thorough investigation of the perjury allegations had been conducted between February 1987 and March 1988 and had yielded no foundation for the allegations made by plaintiffs.

### D. *Section 1983 Litigation*

In July 1987 plaintiffs instituted this civil action pursuant to 42 U.S.C. § 1983 and the court's pendent jurisdiction over state law claims. They maintain that a cover-up of the diner incident began almost immediately after the fight, when the defendant officers gave a false account, claiming to have been the victims of assault, and the investigating police failed to adequately investigate. Plaintiffs allege that the officers failed to report any criminal wrongdoing until they realized it had become necessary to construct a story to cover up their own misconduct. In explanation, plaintiffs point to the fact that the defendants wished to distance themselves from any charges of wrongdoing because some were close to retirement or previously had been charged with misconduct.

In addition to suing the individual defendants, plaintiffs sued the County, arguing that it was responsible for the actions of the individual defendants. *See Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (local government bodies such as counties and municipalities can be sued and held liable for damages under 42 U.S.C. § 1983). The County had, in their view, through its police department in concert with the District Attorney's Office, engaged in a pattern of conduct that condoned or even encouraged the deliberate or reckless indifference to evidence that their employees were violating constitutional rights.

By the time of the federal trial in May 1989, only one of the individual defendants, Prim, was still employed as an active duty police officer. The others had retired. Twenty-four witnesses, including plaintiffs and all of the individually named defendants, testified.

Shortly before the trial, the Commission had issued a report entitled "An Investigation of the Suffolk County District Attorney's Office and Police Department." The SIC Report followed a formal investigation initiated by the Commission in January, 1986.

The Commission concluded that the leadership of both the District Attorney's office and the police department had systematically mismanaged their offices, had tolerated or even encouraged employee misconduct, and had failed to investigate or punish such misconduct. Defendants dispute the findings made by the Commission, asserting that proper internal procedures were in place and working in both the Police Department and District Attorney's Office, that neither had engaged in illegal acts, and that the investigation had been motivated by political animus, had been improperly conducted and had in some cases seriously impeded the prosecution of pending criminal cases and investigations.

Plaintiffs sought to introduce the entire SIC Report as well as other prior reports cited in it. Notice prior to trial had been given of this intention. Not until portions of the report were sought to be read to the jury did defendants request an evidentiary hearing on its trustworthiness. After preliminary argument, the court declined to interrupt the trial to conduct an evidentiary hearing. It did, however, inform defendants that they would be permitted to seek a post-trial review of the report's trustworthiness in the event the County was found liable.

The court refused to admit the entire SIC report, or any of the other reports offered by plaintiffs. Instead, as noted above, it allowed each side to select a few findings from the report to be read to the jury. It found as a preliminary matter that they were admissible. *See* Fed.R.Evid. 104(a)

("Preliminary questions concerning the ... admissibility of evidence shall be determined by the court...."). The court denied plaintiffs' request to have a copy "admitted into evidence" so that the jury could refer to it during deliberations.

The parties agreed to accompany the excerpts with a preface briefly explaining to the jury where the findings came from and why only portions rather than the entire 199–page report were being read. This introduction also emphasized that the report had neither concerned itself with nor made any findings with respect to the Gentile and Rydstrom case. Finally, the court, at the request of the parties, stressed that the excerpted portions of the report were relevant only to the claim against the County. The following was read to the jury:

In April, 1989, the State of New York Commission of Investigation—that's the statewide commission appointed pursuant to statute—issued a 199 page report entitled, "An Investigation of the Suffolk County District Attorney's Office and Police Department." Various findings were made by this commission that are now being offered by the plaintiffs with respect to their claim against the defendant County of Suffolk.

The findings of this Commission are irrelevant to the claims against the four police officers and are admitted in regard to the claim against Suffolk County for whatever weight you wish to give them. You may consider these findings when you are deciding whether the defendant County of Suffolk is liable to the plaintiffs.... [E]ven should you find the individual defendants liable, that doesn't mean the County is liable unless the County has in effect approved or condoned this kind of activity.

So the SIC report is concerned only with the issue of whether the County of Suffolk by course of conduct condoned activities which you may or may not find constituted a violation of the plaintiffs' constitutional rights....

[R]ather than introduce the whole ... report [I have] taken a few of the key quotations that bear directly on this mat-

ter. I want to emphasize again, that there is no proof at all and you should not assume that the SIC, State Investigation Commission, made any findings at all with respect to this case.... This is just general conduct.

There were a number of other reports which are referred to in the State Investigation Commission, reports of an earlier date, a date which preceded the 1981 events at the diner and beyond, so you could find, therefore, that the County had notice earlier than 1981 that there might have been illegal activities by police which were not sufficiently controlled [and therefore constituted] a course of conduct....

[H]ere are the quotes....

1) Despite over a decade of warnings in the form of court decisions and grand jury and bar association reports, both the Police Department and the District Attorney's Office continued to ignore or to inadequately investigate and punish employee misconduct.

2) One of the findings of the Commission has been the systematic failure of the District Attorney's Office to investigate and take appropriate action where it has uncovered or been informed of misconduct by its own employees and other law enforcement personnel.

3) The Commission has determined that misconduct, improprieties and poor management were characteristic of the oversight and control of police personnel by the Suffolk County Police Department. Problems ranged to the failure in the procedure employed by the Department in the investigation and punishment of police misconduct.

4) The Suffolk County Police Department's behavior with regard to misconduct investigations was neither recent nor due to lack of notice of the shortcomings of the Department's procedures and practices.

5) Earlier reports provided the Department with notice of the need to reform its procedures in misconduct investigations. However, the Department did not take that path.

6) The Commission's investigation of the Suffolk County Police Department and District Attorney's Office was initiated following an October 29, 1985, letter from Suffolk County Court Judge Stuart Namm to Governor Mario M. Cuomo, and Judge Namm's public complaints, which came to the Commission's attention. There were other reasons stated in the report for the investigation besides Judge Namm's complaints.

7) The Commission feels confident that the vast majority of police and prosecutorial personnel in Suffolk are persons of ability, industry and integrity.

At the conclusion of the reading, the court reemphasized that there was no indication in the report that the individual defendants "did anything wrong," and that the findings made in the Report should be considered only if the jury first found the individual defendants liable. Before allowing the trial to proceed, the court asked counsel whether there were any further instruction either side wished. Counsel for both parties responded in the negative. Subsequently, at the time it charged the jury, the court once again emphasized the

limitations that [the court] thought that kind of report would have in arriving at your decision, but nevertheless if you believe it to be helpful, you may consider it against the County, but not against the individual defendants.

The jury returned a verdict for plaintiffs in May, 1989, finding the individual defendants liable, but assessing no monetary damages. It found the county liable under both state and federal law, and assessed a total of $300,000 in damages for the state and federal violations, split equally between the plaintiffs.

### E. *Post–Trial Trustworthiness Hearing*

After the verdict, defendants moved for and were granted a post-trial hearing on the admissibility of the report under Rules 401, 402, 403 and 803(8)(C) of the Federal Rules of Evidence. *See Fayson v. Shannon & Luchs,* No. 88–0144, 1988 WL 56934 (E.D.Pa., May 27, 1988) (LEXIS, Genfed li-

brary, Dist file) ("Fairness dictates that if the plaintiff is going to rely upon the report for the truth of the facts stated therein, defendant ought to have the opportunity to challenge its trustworthiness.") (citation omitted).

Defendants called four witnesses: Roger Shannon, Deputy Chief of Patrol for the police, Steven Hovani, Deputy Chief of the District Attorney's Appeals Bureau, Nicholas Negosh, the Chief Trial Prosecutor in the District Attorney's Office, and John Kennedy, assistant counsel to the State Investigation Commission. Neither plaintiffs nor the SIC called any witnesses. Extensive documentary evidence was also admitted.

## III. STATE INVESTIGATION COMMISSION REPORT

The Temporary Commission of Investigation of the State of New York was established in 1958 in accordance with the New York State Constitution, Article V, Section 3, and pursuant to enabling legislation. *See In re Henry v. New York State Comm'n of Investigation*, 143 A.D.2d 914, 533 N.Y.S.2d 690 (2d Dep't 1988). *See also In re Comm'n of Investigation v. Lombardozzi*, 7 A.D.2d 48, 180 N.Y.S.2d 496 (1st Dep't 1958) (sustaining constitutionality of 1958 Act), *aff'd*, 5 N.Y.2d 1026, 185 N.Y.S.2d 550, 158 N.E.2d 250 (1959). Its purpose was, *inter alia*, to make "reports [pertaining to matters relating to law enforcement] to the governor, or to the governor and legislature, as it shall deem advisable, or as shall be required by the governor." N.Y. Unconsol.Law § 7502(9). *See also Henry v. New York State Comm'n of Investigation*, 141 Misc.2d 849, 535 N.Y.S.2d 859, 864 (Sup.Ct.), (Commission shall " 'keep the public informed as to ... problems of criminal law enforcement in the state,' ") (quoting N.Y.Unconsol.Law § 7502(10)), *aff'd*, 143 A.D.2d 914, 533 N.Y.S.2d 690 (2d Dep't 1988). The Commission is temporary only insofar as its enabling legislation must be periodically renewed—generally every two years. Reenactments of the statute have been made upon each expiration date since 1958. The Commission was given a broad mandate to conduct investigations concerning the possible misconduct of public officers, and possible breaches of the "faithful execution and effective enforcement of the laws of the state." N.Y.Unconsol.Law § 7502(1)(a). It is vested by state law with the authority to investigate the internal management or affairs of any department, board, bureau, commission or other agency of the state. *Id.* § 7502(3).

The SIC is composed of six members: two are appointed by the Governor, two by the temporary president of the State Senate, and two by the speaker of the Assembly. N.Y.Unconsol.Law § 7501(2). The bipartisan nature of this executive-legislative Commission is assured by statute; no more than three of the members may belong to the same political party. *Id.* § 7501(3).

The SIC is required to make an annual report, accompanied by its recommendations, to the Governor and Legislature, *id.* § 7502(9), but is also permitted to issue such additional reports as it deems advisable and appropriate. *Id.* § 7502(9)–(10). Over the course of its life, the Commission's investigations have resulted in more than twenty reports. A sampling includes the following: *Law Enforcement in Buffalo* (1961); *The Management and Operations of the Lackawanna Police Department* (1969); *Police Corruption and Related Matters in the City of Albany* (1974); *A Vehicular Death in St. Lawrence County—Duties Neglected and the Need for Improved Accident Investigation Training in Rural Counties* (1984); and *An Investigation into Allegations of Racial Bias Practiced by Criminal Justice Authorities in Orange County* (1988).

The Commission is governed by procedures set forth in section 73 of the New York Civil Rights Law. These procedures " 'meet the constitutional requirements of due process for investigative agencies.' " *Henry v. New York State Comm'n of Investigation*, 141 Misc.2d 849, 535 N.Y.S.2d 859, 863 (Sup.Ct.1988) (quoting *People v. Mitchell*, 40 A.D.2d 117, 338 N.Y.S.2d 313, 319 (3d Dep't 1972) (citation omitted). *See also Liberal Party v. Commission of Investigation*, 579 F.Supp. 755, 756 (E.D.N.Y. 1984) (McLaughlin, J.) (New York state

laws—embodied in Civil Rights Code § 73, in sections 7501 *et seq.* of the Unconsolidated Laws and in section 2304 of the Civil Procedure Law and Rules—"provide witnesses appearing before the [SIC] with the substantive and procedural rights required by the New York State and United States Constitutions.").

Investigation of the Suffolk County Police Department and District Attorney's Office was prompted by recurrent public criticisms of Suffolk County law enforcement dating back at least as far as the mid-1970's. These complaints appeared in numerous publications: in the news media, in a number of published decisions in homicide cases made by the New York State Court of Appeals, and in several other public reports, including a 1980 Suffolk County Bar Association Report and a 1976 grand jury report. By its own undisputed account, the Commission had also received what it felt was "an unusually large number of complaints regarding [police and District Attorney Office] misconduct." SIC Report at 17. The specific censure varied from time to time. At times reproof had targeted police brutality, failure to follow proper practices in questioning suspects and obtaining confessions, and mishandling by both the police and the District Attorney's Office of allegations of criminal misconduct made against members of the Police Department. The common theme throughout was one of misconduct and mismanagement tolerated at the highest levels.

The event that precipitated the Commission's investigation was Suffolk County Court Judge Stuart Namm's "public criticism, in late 1985, of police and prosecutorial misconduct in two homicide prosecutions" resulting in acquittals. SIC Report at 5. *See also id.* at 16. Judge Namm wrote to Governor Cuomo, requesting that the Governor appoint a special prosecutor to pursue allegations of " 'perjury, subornation of perjury, intimidation of witnesses, spoliation of evidence, abuse of subpoena power....' " *Id.* at 16–17. After a preliminary inquiry, the Commission in January, 1986, initiated a formal investigation.

During the nearly three years of its investigation, the Commission was contacted by over 200 complainants regarding County law enforcement matters. *Id.* at 19. It interviewed

several hundred witnesses, [held] nearly 100 private hearings consisting of sworn testimony, [as well as] four days of public hearings during which 42 witnesses testified; and [reviewed] tens of thousands of pages of documents, including trial and hearing transcripts, prosecution files, police reports and files, and the files of several hundred Suffolk County Police Department Internal Affairs Division investigations and hundreds more files of Suffolk County Human Rights Commission complaints involving Suffolk law enforcement.

*Id.* at 21. Suffolk County cooperated with the investigation and furnished many of the documents relied upon by the Commission.

Although the Commission initially focused on the handling of homicide cases, the scope of the investigation was soon expanded to cover allegations of impropriety, mismanagement and lack of oversight in narcotics investigations and instances of illegal wiretapping conducted by the police with the knowledge of the District Attorney's Office. *Id.* at 20. Allegations of misbehavior were not limited to these areas. *Id.* at 18–21. The common theme throughout, regardless of the particular context, was that neither the Police Department nor the Office of the District Attorney, acted to ensure that all employees "accused of misconduct, or even criminal behavior, were properly investigated and punished when warranted." *Id.* at 18–19. The SIC Report concludes:

The Commission has determined that misconduct, improprieties and poor management were characteristic of the oversight and control of police personnel by the Suffolk County Police Department. Problems ranged from deficiencies in routine management functions, such as personnel evaluation and overtime rules, to the disastrous failure in the procedure employed by the Depart-

ment in the investigation and punishment of police misconduct.

*Id.* at 151.

## IV. RELEVANCE (RULES 401–402)

■ Determination of admissibility of the SIC report requires a four-part inquiry. First, the report must be relevant under Rules 401 and 402 of the Federal Rules of Evidence. Second, it must be sufficiently trustworthy and reliable to be admitted as an exception to the hearsay rule under Federal Rule of Evidence 803(8)(C). Third, considerations of trial efficiency must support use. Fourth, the report should be excluded under Rule 403 if the danger of unfair prejudice outweighs its probative value. We turn first to relevance.

> Federal Rule of Evidence 401 reads:
> "Relevant evidence" means evidence *having any tendency* to make the existence of *any fact that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence.

(Emphasis added.) Rule 401 is meant to be read in conjunction with Rule 402, which states:

> *All relevant evidence is admissible,* except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

(Emphasis added.) Together Rules 401 and 402 express the federal policy underlying the federal rules, which favors liberal admission of evidence.

A municipality can be held liable in a section 1983 suit "only where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037 and *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981)). *See Pembaur v. Cincinatti,* 475 U.S. 469, 479–80, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (municipal liability limited to action

for which municipality is actually responsible). Thus, under *Monell* and subsequent cases, the federal courts have required section 1983 plaintiffs to first prove the existence of a municipal custom or policy. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 829–30 & n. 3, 105 S.Ct. 2427, 2439–40 & n. 3, 85 L.Ed.2d 791 (1985). The policy can consist of either acts or omissions on the part of the city. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1208, 103 L.Ed.2d 412 (1989) (O'Connor, J., concurring in part and dissenting in part). It need not be "authorized by written law or express municipal policy," but may be "'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)). Plaintiffs must show that the municipal custom is "so well settled and widespread that the policy making officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.1989) (citations omitted), *cert. denied,* —— U.S. ——, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989).

Second, there must be some "affirmative link between the policy and the particular constitutional violation alleged." *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). The "municipality *itself* [must have] cause[d] the constitutional violation at issue." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989) (citing *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)) (emphasis in original). *See also City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988). Civil rights plaintiffs often have a difficult task establishing both the existence of a municipal practice or policy and the "causation" element of the claim. *See, e.g., Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (despite considerable evidence of pattern of police misconduct,

court finds that plaintiff failed to prove existence of pervasive agency practice or policy).

The significance of the SIC report—and specifically of those excerpts read to the jury—lies in its tendency to support plaintiffs' claim that there was a County policy or custom of failing to take proper action in investigating and, where warranted, in disciplining or prosecuting instances of official misconduct. · This policy, they allege, encouraged police misconduct of the kind reflected in defendants' actions.

Defendants claim that the report is not relevant to plaintiffs' *Monell* claims because it does not specifically address the *diner* incident or the subsequent criminal case. In support of this argument they cite a recent Second Circuit opinion, in which the Court of Appeals sustained a district court ruling excluding the same SIC report because the plaintiff had failed as an initial matter to show that it was relevant to his case. *Janetka v. Dabe*, 892 F.2d 187 (2d Cir.1989) (reversing district court dismissal of plaintiff's claim of malicious prosecution on false arrest charge). Because the report was excluded on the basis of relevance, the *Janetka* court did not reach the trustworthiness question. *Id.*, at 191.

The differences between *Janetka* and the case at bar prevent the former from controlling determinations of relevance in particular and admissibility in general. Unlike plaintiffs in the case at bar, the plaintiff in *Janetka* "did not produce a copy of the report for the court, nor did he make an offer of proof as to which portions of the report were relevant to the case." *Id.* (citation omitted). In addition, the procedural postures of the two cases differed. *Janetka* came before the Court of Appeals on appeal of a district court order dismissing a complaint and directing a verdict for the County. On the record before it, the Court of Appeals affirmed the lower court's ruling that the report was inadmissible. In contrast, Gentile and Rydstrom's claims against the county were fully tried, a verdict was rendered, a post-trial hearing held and post-trial briefs and arguments enter-

tained. If anything is to be divined from *Janetka*, it is that evidentiary determinations made by district courts are reviewed under an extremely deferential standard. *See Hines v. Brandon Steel Decks, Inc.,* 886 F.2d 299, 302 (11th Cir.1989); *In re Aircrash in Bali, Indonesia,* 871 F.2d 812, 816 (9th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 277, 107 L.Ed.2d 258 (1989); *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1257 (2d Cir.1987).

Contrary to defendants' assertions, an affirmative showing of specific knowledge and reliance by individual police officers is merely the most obvious—and by no means the exclusive—method of establishing the necessary link between individual behavior and municipal practice or policy. As the authority cited by the *Janetka* court in its discussion of causation explicitly recognized, a "plaintiff 'must link the behavior in question to the policy of failure to discipline—*for example,* the officer must have known of the policy at the time he allegedly committed the civil rights violations.'" *Id.* (quoting *Anderson v. City of New York,* 657 F.Supp. 1571, 1575–76 (S.D.N.Y. 1987) (emphasis added)). It is an appropriate and permissible inference that individual police officers are aware of a well known and pervasive policy of the department affecting important aspects of their work. In this case the preponderance of evidence supported the conclusion that the defendant police officers were aware of departmental and prosecutorial policy.

The courts may not condition admissibility on plaintiffs' ability to prove by a higher standard than more probable than not that individual violators of civil rights knew of and specifically relied upon the constitutionally infirm or otherwise improper policy of a municipal employer. *See* Fed.R.Evid. 104(a), 401, 412. A more restrictive policy would be contrary not only to the liberal policy of admission underlying Rules 401 and 402 of the Federal Rules of Evidence, *see Beech Aircraft Co. v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 450, 102 L.Ed.2d 445 (1988), but would also, in cases such as the instant one, undermine Congressional civil rights policy. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 832, 105 S.Ct. 2427,

2440, 85 L.Ed.2d 791 (1985) (Section 1983 actions should be available for all victims of constitutional violations of municipalities); *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 700–01, 98 S.Ct. 2018, 2040–41, 56 L.Ed.2d 611 (1978) (Congress intended to provide broadly construed remedy against "all forms of official violation of federally protected rights" including violations for which municipality bears responsibility).

The law recognizes that lax discipline creates an atmosphere encouraging police misconduct. *See, e.g., Sarus v. Rotundo,* 831 F.2d 397, 400–01 (2d Cir.1987); *Fiacco v. City of Rensselaer, N.Y.,* 783 F.2d 319, 327 (2d Cir.1986) ("deliberate indifference"), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); *Batista v. Rodriguez,* 702 F.2d 393, 397–98 (2d Cir. 1983) ("persistent failure to discipline"). "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission *is substantially certain to result* in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1208, 103 L.Ed.2d 412 (1989) (O'Connor, J., concurring in part and dissenting in part) (emphasis added). *See Oklahoma City v. Tuttle,* 471 U.S. 808, 832, 105 S.Ct. 2427, 2440, 85 L.Ed.2d 791 (1985) (at issue is whether policy or custom exists that will foreseeably and avoidably cause in the future the violation of constitutional rights of an individual); *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.1989) (where policy is widespread and well settled, municipal policymaking officials can be said to have either actual or constructive knowledge), *cert. denied,* —— U.S. ——, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989) (citing, *inter alia, City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988)); *Fiacco v. City of Rensselaer, N.Y.,* 783 F.2d 319, 327 (2d Cir.1986) (proof of deliberate indifference on part of municipality to possible use of excessive force by police officers is sufficient to satisfy requirement under section 1983 that policy of city "caused" injury),

*cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). The "threat of liability against the city ought to increase the attentiveness with which officials at the higher levels of government supervise the conduct of their subordinates." *Owen v. City of Independence,* 445 U.S. 622, 652 n. 36, 100 S.Ct. 1398, 1416 n. 36, 63 L.Ed.2d 673 (1980).

It is the obligation of the municipality to control its personnel operating under its aegis with color of state authority. As the Court of Appeals for the Second Circuit has observed, a municipality "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating." *Fiacco v. City of Rensselaer, N.Y.,* 783 F.2d 319, 327 (2d Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). Encouraging illegal action by direction or by flaccid exercise of authority is equally dangerous. Either encourages conduct made actionable by section 1983.

The appropriate inquiry in this *Monell*-type claim focuses on the actual or constructive knowledge of the municipality as well as upon the implied knowledge and reliance of municipal employees on that practice. Not only does the SIC report tend to establish the existence of a municipal policy or practice, but it also supports plaintiffs' allegation that the police and the District Attorney's Office were likely because of a course of conduct to consistently ignore evidence of misconduct on the part of the defendant officers and to sanction and cover up any wrongdoing connected with the Gentile and Rydstrom investigation. *Cf.* Fed.R.Evid. 406 ("Evidence of the ... routine practice of an organization ... is relevant to prove that the conduct of the ... organization on a particular occasion was in conformity with the ... routine practice.").

The SIC report details numerous incidents of police and prosecutorial misconduct in Suffolk County—evidence that clearly supports a finding of at least constructive knowledge on the part of the Police Department and District Attorney's of-

fice. The report also contains material that tends to support plaintiffs' argument that published criticisms put the County on *actual* notice as far back as the mid–1970's. As the Commission concludes:

> [d]espite over a decade of warnings—in the form of court decisions and grand jury and bar association reports—both the Police Department and the District Attorney's Office continued to ignore or to inadequately investigate and punish employee misconduct.

SIC Report at 20.

Defendants' assertion that the SIC report is inadmissible as lacking in probative value because it does not deal with the underlying Gentile and Rydstrom criminal case is without merit. It is sufficient for purposes of Rules 401 and 402 that the report tends to support an inference of an affirmative link between municipal policy and the *type* of individual behavior involved here. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 832, 105 S.Ct. 2427, 2440, 85 L.Ed.2d 791 (1985) ("A § 1983 cause of action is as available for the first victim of a policy or custom that would forseeably and avoidably cause an individual to be subjected to deprivation of a constitutional right as it is for the second and subsequent victims."). The language of Rule 401 is deliberately inclusive; the intent of the rule's drafters was to admit "evidence having *any* tendency" to support plaintiffs' claim. Fed.R.Evid. 401. *See In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 279 (3d Cir.1983) (doubts as to whether proffered evidence would be helpful to trier of fact should be resolved in favor of admissibility) (citation omitted), *rev'd on other grounds sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348; 89 L.Ed.2d 538 (1986). No requirement that the report address the specific facts of the case can be drawn from the language of the rule or from the case law.

Nor is there merit to defendants' argument that the report lacks relevance because the diner incident did not involve a homicide, narcotics, or any wiretapping activities—the primary foci of the SIC report. As noted *supra,* the SIC report explicitly concludes that mismanagement and misconduct were endemic in the Suffolk County Police Department and Suffolk County District Attorney's Office and were not confined to any one area. Even if the Commission had "limited" itself to wiretapping, homicide and narcotics cases, the SIC report would still provide such exhaustive evidence of widespread malaise that a jury might well have been entitled—at least as an initial matter under Rules 401 and 402— to infer from it that Suffolk County was aware that such behavior permeated the police department. For the same reason, the fact that none of the defendants were assigned to homicide or narcotics divisions does not detract from the report's relevance. Thus, the findings made in the SIC report and read to the jury have at least a "tendency" to establish that there was a policy, practice, or custom or usage of inadequate investigation and discipline of employee misconduct. The SIC report more than meets the minimal threshold standards governing relevance set forth in Federal Rules of Evidence, under Rules 401 and 402.

## V. HEARSAY (RULE 803(8))

### A. *Public Reports Generally*

■ The report was introduced to prove the truth of its assertions. As used it was hearsay. Fed.R.Evid. 801. Federal Rule of Evidence 803(8) excepts "public records and reports" from exclusion as evidence under the hearsay rule. The rule defines public records and reports "in any form" broadly as follows:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

The "public records and reports" exception to the hearsay rule is based on the experience of the drafters, the Supreme

Court as promulgating authority, and Congress and the President as enacting authorities. These experienced men and women recognized the reliability of most reports written and published by government agencies as part of their official duties under the direction or permission of the law. *See Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 805 F.2d 49, 54 (2d Cir.1986) (it is assumed that "public officials perform their duties properly without motive or interest other than to submit accurate and fair reports"); *Fraley v. Rockwell Int'l Corp.*, 470 F.Supp. 1264, 1266 (S.D.Ohio 1979) (under Rule 803(8)(C) investigation need only be *permitted* by law; it need not be required).

There are practical reasons for allowing public reports to be admitted. It would be almost impossible to require individual investigators to appear in court to testify any time the results of an investigation were probative of issues in individual litigation. Few individual litigants—particularly in civil rights cases—have the resources to duplicate the type of exhaustive reports produced by public agencies and funded by the taxpayers. *See* Note, *The Trustworthiness of Government Evaluative Reports Under Federal Rule of Evidence 803(8)(C)*, 96 Harv.L.Rev. 492, 509 (1982) (suggesting that Rule 803(8)(C) operates as an important link between administrative and judicial systems by allowing private litigants to take advantage of a valuable and generally reliable public resource). Litigants should not be denied use of critical evidence because they lack the financial ability to duplicate it. *See id.* at 505–06 (placing restrictions on admissibility of government reports favors institutional parties and suggests class bias).

A wide variety of public documents have been admitted pursuant to Rule 803(8)(C). *See, e.g., Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 443, 102 L.Ed.2d 445 (1988) (Navy report investigating and giving opinion on cause of air crash); *Meriwether v. Coughlin*, 879 F.2d 1037, 1039 (2d Cir.1989) (SIC Report entitled "Corruption and Abuses in the Correctional System: The Green Haven Correctional Facility," concluding that there was

widespread and institutionalized corruption among correctional staff); *Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 805 F.2d 49, 54–55 (2d Cir. 1986) (FBI reports prepared for related criminal action); *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238 (3d Cir.1983) (United States Treasury reports prepared under the Dumping Act, as well as findings of the Japanese Fair Trade Commission), *rev'd on other grounds sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Litton Systems, Inc. v. AT & T Co.*, 700 F.2d 785, 818 (2d Cir.1983) (Federal Communications Commission decisions describing AT & T tariffs as "unnecessarily restrictive", unjust and discriminatory); *Kehm v. Procter & Gamble Manufacturing Co.*, 724 F.2d 613, 617–620 (8th Cir. 1983) (epidemiological studies conducted by the Centers for Disease Control and various state health departments on the relationship between tampon use and incidence of toxic-shock syndrome); *United States v. School District*, 577 F.2d 1339, 1354–55 (6th Cir.1978) (HEW finding that a school "had been established and maintained ... for segregatory purposes"); *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1239–41 (E.D.N.Y.1985) (federal, state, and Australian government epidemiological studies), *aff'd*, 818 F.2d 187 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988).

Trial courts traditionally have been granted broad discretion to use their "common sense," *Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 805 F.2d 49, 54 (2d Cir.1986), in determining " 'whether the hearsay document offered in evidence has sufficient independent indicia of reliability to justify its admission.' " *United States v. Durrani*, 835 F.2d 410, 425 (2d Cir.1987), (quoting *City of New York v. Pullman, Inc.*, 662 F.2d 910, 914 (2d Cir.1981), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982)). *See also S.E.C. v. First City Financial Corporation, Ltd.*, 890 F.2d 1215, 1225 (D.C.Cir.1989) (trial court enjoys broad dis-

cretion in assessing probity and trustworthiness of documents introduced pursuant to Rule 803); *Miller v. New York Produce Exchange,* 550 F.2d 762, 769 (2d Cir.) (admission of evidence is within broad discretion of district court), *cert. denied,* 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977).

B. *Assumption of Reliability*

An authorized report of a government agency is assumed to be trustworthy absent evidence to the contrary. *See, e.g., Kehm v. Procter & Gamble Manufacturing Co.,* 724 F.2d 613, 618 (8th Cir.1983) (affirmative showing of untrustworthiness required); *United States v. AT & T Co.,* 498 F.Supp. 353, 360 (D.D.C.1980). Courts may review and edit portions of such reports; the edited portions retain the assumption of reliability accorded the government investigation as a whole. *In re Air Crash Disaster at Stapleton International Airport, Denver, Colorado,* 720 F.Supp. 1467, 1497 (D.Colo.1989) (citations omitted). The burden is on the party opposing introduction to make " 'an affirmative showing of untrustworthiness, beyond the obvious fact that the declarant is not in court to testify.' " *Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 805 F.2d 49, 54 (2d Cir.1986) (citation omitted). *See also Keith v. Volpe,* 858 F.2d 467, 481 (9th Cir.1988) (assumption is one of trustworthiness, with burden of establishing untrustworthiness on opponent of evidence); *Ellis v. International Playtex, Inc.,* 745 F.2d 292, 301 (4th Cir.1984) (same); Advisory Committee Note to Rule 803(8), 56 F.R.D. 183, 313 (1972) ("[T]he rule ... assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present.").

"[F]actually based conclusions or opinions are not on that account excluded from the scope of Rule 803(8)(C)." *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 446, 102 L.Ed.2d 445 (1988). Opinions and conclusions in official reports are admissible if they are "based on factual investigation." *Id.* 109 S.Ct. at 449. *Beech Aircraft* did not explicitly address the issue of an evaluative report's reliability, but

merely noted that Rule 803(8) "requires the [trial] court to make a determination as to whether the report, or any portion thereof, is sufficiently trustworthy to be admitted." *Beech Aircraft, Id.* at 449.

The credibility of the SIC report itself was implicitly acknowledged in a recent Eastern District case. *See Quartararo v. Mantello,* 715 F.Supp. 449, 466 & nn. 17, 18 (E.D.N.Y.) (Korman, J.) (granting a habeas petition because "petitioner's confessions were improperly obtained and erroneously used against him at his trial"), *aff'd mem.,* 888 F.2d 126 (2d Cir.1989). *Quartararo* found that the Suffolk County Police "deliberately violated the Constitution of the United States and the laws of the State of New York to obtain a confession" from the petitioner, who was convicted of homicide. *Id.* at 466. The court observed that the State Investigation Commission had found that "the manner in which [the police] conducted the investigation" into the victim's death to be "characteristic of conduct long tolerated by responsible officials of the Suffolk County Police Department and the District Attorney's Office...." *Id.* at 466 & n. 18 (citing SIC report at 28).

It is incontrovertible that the Temporary Commission of Investigation of the State of New York had the authority pursuant to its enabling statute to investigate Suffolk County's law enforcement agencies. *See* N.Y.Unconsol.Law § 7502; *Henry v. New York State Comm'n of Investigation,* 141 Misc.2d 849, 535 N.Y.S.2d 859 (Sup.Ct.) (refusing to enjoin Commission from issuing public report of its Suffolk County investigation and holding that Commission did not exceed its jurisdiction or violate rights of those being investigated), *aff'd,* 143 A.D.2d 914, 533 N.Y.S.2d 690 (2d Dep't 1988). Compare, *e.g., Pearce v. E.F. Hutton Group, Inc.,* 653 F.Supp. 810, 814 (D.D.C. 1987) (draft report of Congressional subcommittee not admissible under Fed.R. Evid. 803(8)(C) because investigation was not within scope of subcommittee's investigatory authority, but rather, was carried out as part of its oversight responsibilities).

The factual findings read from the SIC report to the jury were more than mere

recitations of factual observations. Although they represented the final evaluation and conclusions of the Commission, they were based on its factual studies. Whether they are sufficiently reliable to be admissible under Rule 803(8)(C) is the question to which we now turn.

### C. *Criteria Of Trustworthiness*

Courts have looked to a number of factors in determining whether conclusions in an official report should be admitted as an exception to the hearsay rule. The Advisory Committee, which drafted the Federal Rules of Evidence, in its notes proposed a "nonexclusive" list of four factors emphasizing reliability. Advisory Committee note to 803(8), 56 F.R.D. 183, 313 (1972); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 449 n. 11, 102 L.Ed.2d 445 (1988). These are listed *infra*, (1)–(4). To these four we add a fifth, the finality of the findings. This was one of several additional guides employed by Judge Becker in a massive antitrust case in which the court was required to rule on the admissibility of hundreds of thousands of public documents. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 505 F.Supp. 1125, 1147 (E.D.Pa.1980), *aff'd in part and rev'd in part sub nom. In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238 (3d Cir.1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The tests useful to a court considering admissibility of conclusions under Rule 803(8)(C) are:

1. the timeliness of the investigation;
2. the special skill or experience of the officials conducting the investigation;
3. the procedures governing any hearings;
4. the existence of motivation problems on the part of either the investigators or other sources of information;
5. the finality of the findings made in the report.

Interpretation of the original four suggestions of the Advisory Committee is greatly aided by Judge Becker's exhaustive analysis of Rule 803(8)(C) in *Zenith Radio*

*Corp. v. Matsushita Electric Industrial Co.*, 505 F.Supp. 1125, 1146–50 (E.D.Pa. 1980), *supra*. After discussing the Advisory Committee factors, the *Matsushita* court went on to suggest seven additional criteria, which, it observed "emerged from the crucible of [its evidentiary] hearings." *Id.* at 1147. The additional *Matsushita* factors were not explicitly adopted by the Third Circuit on appeal. *See In re Japanese Electronics Products Antitrust Litigation*, 723 F.2d 238, 265 (3d Cir.1983). The first of them—finality of the agency findings—has already been added to the list enumerated above. Insofar as the other six essentially expand upon factors already set forth, they are incorporated into the discussion at the appropriate points. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 505 F.Supp. 1125, 1147 n. 16 (acknowledging that "[s]everal of these criteria are essentially refinements of the Advisory Committee's criteria").

When it adopted the Federal Rules of Evidence in 1974, Congress impliedly approved the Advisory Committee's list of four explanatory factors. *See* S.Rep. No. 1277, 93rd Cong., 2d Sess. 18, *reprinted in* 1974 U.S.Code Cong. & Admin.News 7051, 7064–65; H.R.Rep. No. 650, 93rd Cong., 2d Sess. 14, *reprinted in* 1974 U.S.Code Cong. & Admin.News 7075, 7088. As a result, the courts generally have structured their analyses of trustworthiness around these four criteria. *See, e.g., Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 449 n. 11, 102 L.Ed.2d 445 (1988) (citing advisory committee note). We address these, as well as additional factors, in the order listed above.

### 1. Timeliness

By emphasizing the timeliness of the investigation, the Advisory Committee sought to avoid dependence on stale evidence. Timeliness is particularly important where an accident is being investigated. In such cases, it is important to interview witnesses before memories fade and to inspect physical evidence before it is affected by the passage of time or by tampering. *See generally* Note, *Admitting Opinions*

*and Conclusions in Evaluative Reports: The Trustworthiness Inquiry,* 64 Wash.L. Rev. 975, 985 (1989).

Where, by contrast, the report is the result of a study or particularly where, as here, the investigators depend heavily upon documents, the passage of time does not appreciably detract from reliability. *See, e.g., Ellis v. International Playtex, Inc.,* 745 F.2d 292, 303 (4th Cir.1984) (finding epidemiological studies conducted well after outbreak of disease occurred, which relied on doctors' reports, to be trustworthy).

The defendants claim that the report is unreliable because it focuses on events that occurred four or more years prior to the start of the investigation. They cite *United States v. Durrani,* 659 F.Supp. 1183 (D.Conn.), *aff'd,* 835 F.2d 410 (2d Cir.1987), in which the district court excluded the Report of the President's Special Review Board (the Tower report), concerning the Iran-contra affair. Although the Tower report was issued pursuant to executive order, and, like the SIC report, was the result of a special investigation, the court nonetheless found the "two year lapse of time [to be a] circumstance substantially undermining the trustworthiness of the report." *Id.* at 1186–87.

Passage of time was not the only reason given by the Court of Appeals for exclusion when it affirmed the district court's decision. The appellate court relied heavily upon the limitations placed on the Board's ability to gather evidence. For example, unlike the SIC, the Tower Board had no authority to subpoena documents, compel testimony, swear witnesses, or grant immunity, suffered under the handicap of a lack of resources and legal authority and felt compelled to conclude its inquiry in some haste. *United States v. Durrani,* 659 F.Supp. 1183, 1187 (D.Conn.), *aff'd,* 835 F.2d 410 (2d Cir.1987). In fact, the district court concluded that the Tower Board was not an investigatory body as envisioned by Rule 803(8)(C). *Id.*

In addition, the *Durrani* trial court suggested that reliability was undermined by "the possible motivation of the underlying sources of information to mislead the board." *United States v. Durrani,* 835 F.2d 410, 425 (2d Cir.1987). Unlike the SIC, the Tower Board itself warned that the testimony it relied upon was of questionable validity as a result of the " 'the chance that, for whatever reason, individuals concealed evidence or deliberately misled the Board.' " *United States v. Durrani,* 659 F.Supp. 1183, 1187 (D.Conn.) (quoting the Tower Report at III–2), *aff'd,* 835 F.2d 410 (2d Cir.1987). Moreover, the Tower report, unlike the SIC report, did not claim to offer any final conclusions or evaluations. *Id.* The Tower Board acknowledged in its report that it was setting forth the story as " 'we *now* know it.' " *Id.* (quoting Tower Report at III–1) (emphasis added in opinion).

There are additional differences between the instant case and *Durrani* that defeat defendants' attempts to draw parallels. In *Durrani,* the passage of two years was significant because major policymakers who were interviewed were readily acknowledged by the Tower board to suffer "failures of recollection"—failures which the Tower report itself attributed to the fact that they were "busy individuals" for whom the events under investigation " 'were not treated by many of the participants as sufficiently important' " when they occurred. *United States v. Durrani,* 659 F.Supp. at 1186 (quoting the Tower Report at III–2). No such allegations have been made in the context of the SIC investigation. Unlike the Tower Board in *Durrani,* the Commission here delved into practices and procedures that were still current.

In any event, the lesson to be learned from *Durrani* has arguably less to do with any inherent lack of trustworthiness of the Tower report, than with the deferential standard accorded evidentiary determinations made by the district court. *See United States v. Durrani,* 835 F.2d 410, 425 (2d Cir.1987) (noting that the lower court's decision to exclude the Tower Report, while "perhaps ill-advised, given the extremely sparse evidence otherwise available to defendant," was nevertheless within the wide discretion afforded the trial judge). *But*

*cf.* Comment, *The Towering Inferno: Trustworthiness of the Tower Report under Federal Rule of Evidence 803(8)(C)*, 55 Brooklyn L.Rev. 625 (1989) (arguing that Tower Report was trustworthy and that excluding it was an abuse of discretion).

### 2. Special Skill or Experience

The second indication of trustworthiness suggested by the Advisory Committee is the special skill or experience of those conducting the investigation. The subject of this investigation—misconduct and mismanagement of criminal law enforcement agencies—falls squarely within the legislative mandate of the Commission. *See* N.Y. Unconsol.Law § 7502. As noted *supra* in Part III, similar subjects have been the targets of the Commission's investigations and reports for more than 30 years. Moreover, reports issued by the SIC have in the past been accepted as evidence in the federal courts. *See, e.g., Meriwether v. Coughlin,* 879 F.2d 1037, 1039 (2d Cir.1989) (noting admission of SIC Report entitled "Corruption and Abuses in the Correctional System: The Green Haven Correctional Facility," which concluded that there was widespread corruption among correctional staff); *Star Distributors v. Marino,* 613 F.2d 4, 5 (2d Cir.1980) (quoting from 1971 SIC annual report); *United States v. Arroyo,* 494 F.2d 1316, 1317 n. 3 (2d Cir.) (citing 1972 SIC report entitled "Narcotics Law Enforcement in New York City" for street value of heroin), *cert. denied,* 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974); *Bruce v. City of Middletown,* No. 88 CV 1846, 1989 WL 140276 (S.D.N.Y., Nov. 15, 1989) (granting plaintiff's cross-motion to reopen and extend discovery because of new evidence reported in 1989 SIC report entitled "An Investigation Into Allegations of Racial Bias Practiced by Criminal Justice Authorities in Orange County"); *International Union of Electrical, Radio & Machine Workers, Local 453 v. Otis Elevator Co.,* 201 F.Supp. 213, 218 n. 2 (S.D.N.Y. 1962) (quoting from 1961 SIC report entitled "Syndicated Gambling in New York State").

Expertise in matters of law enforcement was possessed by the SIC Commissioners and staff, buttressing the conclusion of reliability. Until recently and throughout the Suffolk County investigation, the Commission was chaired by a former United States Attorney for the Eastern District of New York, who is currently the Dean of the Brooklyn Law School. The other five commissioners are all lawyers. Key members of the staff were lawyers with extensive experience in criminal law enforcement. Compare, *e.g., Fraley v. Rockwell Int'l Corp.,* 470 F.Supp. 1264, 1267 (S.D.Ohio 1979) (Navy investigative report found untrustworthy because it "was prepared by an inexperienced investigator in a highly complex field of investigation"). It is uncontested that the commissioners attended the public hearings in both 1987 and 1988, met over 75 times during a three year period in connection with the Suffolk County investigation and personally reviewed thousands of pages of documents. The Commission clearly possessed the expertise and special skills required to conduct the investigation.

The commissioners and staff—themselves experts—relied upon the type of evidence that law enforcement experts would be expected to scrutinize. *See* Fed.R.Evid. 703; *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1125, 1147, 1149 (E.D.Pa.1980) (listing as criteria of reliability the extent to which fact or data upon which opinions are based are ascertainable or of type reasonably relied upon by experts in field). Compare, *e.g., United Air Lines, Inc. v. Austin Travel Corp.,* 867 F.2d 737, 742–43 (2d Cir.1989) (upholding decision to exclude as untrustworthy various government reports largely because trial court did not consider them to reflect real concerns of business world). This evidence included thousands of records produced by the Suffolk County Police Department and the Suffolk County District Attorney's Office, the testimony of numerous Police Department and District Attorney employees and former employees, as well as of other witnesses, the court records of criminal cases, and reports produced by other reputable sources such as the Suffolk County Bar Association. Most of these underlying materials would be ad-

missible into evidence; the rest would be indirectly available through expert testimony. They obviously do not compromise the reliability of the SIC report. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1125, 1148 (E.D.Pa. 1980) (although reliability of underlying materials is helpful criterion for evaluating trustworthiness of a public report, findings in report may be trustworthy even if based in part on inadmissible hearsay). They also constitute an "ascertainable record on which the [SIC's] findings are based." *Id.* at 1147 (listing existence of such a record as one factor affecting trustworthiness).

In effect, the Commission as a whole qualified as an expert under Rules 702 and 703 of the Federal Rules of Evidence. Whatever hearsay it relied upon was, we find, adequately evaluated and filtered within its capacity as expert. Fed.R.Evid. 703.

Defendants nonetheless seek to exclude the Commission's findings by alleging that the SIC staff was unqualified. At the post-trial trustworthiness hearing defendants called SIC Assistant Counsel John Kennedy as a hostile witness. Kennedy has been employed by the Commission since 1984 and was assigned to the Suffolk County investigation in July of 1986. During his examination, defense counsel elicited the information that Kennedy, although he was admitted to the bar, had never worked either as a prosecutor or defense attorney and that he had never tried a case. In their brief defendants subsequently argued that Kennedy's inability to spontaneously recall the state and federal standards governing grand jury and other criminal proceedings rendered him unfit to serve as counsel to the Commission. Generalizing from this, defendants claim that SIC staff ignorance about criminal due process safeguards in part partially explains why such safeguards were not rigorously applied throughout the investigation. In view of the hands-on criminal law expertise of other members of the staff and of members of the Commission, Kennedy's legal biography is not significant.

The function of the Commission is neither prosecutorial nor adjudicatory. It does not act in a judicial or quasi-judicial capacity and it is not legally bound to adhere to the evidentiary or constitutional standards that apply to criminal proceedings, including Grand Jury investigations. *See* discussion, *infra* at Part V C 3(b). It is conceivable that an investigatory agency could conduct an investigation in so wanton, reckless or inexpert a manner as to violate applicable standards of due process. *Cf. Hannah v. Larche,* 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960). There is no showing that the SIC Commission has done so here. *See generally Henry v. New York State Commission of Investigation,* 141 Misc.2d 849, 535 N.Y.S.2d 859 (Sup.Ct.), *aff'd,* 143 A.D.2d 914, 533 N.Y.S.2d 690 (2d Dep't 1988). Defendants may not now argue that the SIC Report is inadmissible as untrustworthy because Commission members or staff failed to follow procedures that they were not by law under any obligation to follow.

### 3. Due Process in Hearings

Defendants argue that the public and private hearings conducted by the SIC were unfair and less than thorough. Defendants' arguments fall into three categories: a) the failure of the Commission to track down important sources of information favorable to the Police Department and District Attorney's Office, b) the lack of procedural safeguards afforded witnesses and targets of the investigation, and c) the Commission's violation of its own enabling legislation. Other criticisms made by defendants, such as the lack of expertise on the part of the staff have been discussed *supra,* in Part V C 2, or, in the case of improper motivation, *infra* in Part V C 4.

#### (a) Contradictory Evidence

At the post trial trustworthiness hearing defendants claimed that key employees of the Police Department whose testimony would have contradicted the findings of the SIC report were never subpoenaed or interviewed by the Commission. Defendants called Daniel Shannon, Deputy Chief of

Patrol for the Suffolk County Police Department. Shannon had worked in the department's Internal Affairs Division from 1978 to 1983 and was Commanding Officer of Internal Affairs from 1986 to 1988. In addition to challenging the findings of the SIC report, Shannon testified that there had been a thorough investigation of the diner incident which resulted in the disciplining of several defendants in this action. He testified that adequate internal procedures existed. Likewise, District Attorney Chief Trial Prosecutor Nicholas Negosh testified that his office had adopted guidelines for handling charges of employee misconduct, the existence of which the Commission ignored, despite being sent copies.

Plaintiffs and the Commission counter by arguing that the internal investigative and disciplinary procedures referred to by Shannon and Negosh had never been implemented or, at best, were inconsistently and infrequently applied. The Commission characterized the 1987 District Attorney guidelines, promulgated after the SIC investigation had begun, as representing too little done too late.

SIC assistant counsel John Kennedy answered in the affirmative when asked by the court whether he, as a lead investigator, and the Commission had attempted to explore leads that would support the County's position. Kennedy explained that the bulk of the documents reviewed and on which the Commission's findings were based were generated by the County or related to the County's positions on various issues. He testified:

> [I]t was, throughout the investigation, both in the documents and in the witnesses, the overwhelming reliance was placed upon the County's own statement of facts. [T]he County would tell us through the police department, the District Attorney's office and other witnesses, what the policy was on police, on investigating police misconduct. And we would investigate it, but from their own mouths the deficiencies in their procedures were clear, and those were the basis ... for the commission's findings in that regard.

The court finds this testimony to be credible. It does not credit contrary testimony.

The Commission did not interview every potential witness who was familiar with the subject of the investigation. There is, however, a great deal of documentary and testimonial support for the factual findings made in the SIC report and read to the jury. The contradictory evidence proffered by defendants during the trustworthiness hearing does not, in the court's opinion, discredit either the SIC report as a whole, or the excerpted findings. The court finds persuasive testimony and documentation showing that the Commission rested its conclusions on specific factual findings that in numerous instances the Police Department and the District Attorney's Office failed to investigate complaints of misconduct by law enforcement personnel in a timely and thorough manner.

Even in criminal trials not every issue is trailed to its lair. As then Massachusetts Supreme Court Justice Oliver Wendell Holmes pointed out, limitations on the examination of collateral issues are ultimately a "concession to the shortness of life." *Reeve v. Dennett*, 145 Mass. 23, 28, 11 N.E. 938, 944 (1887). More than three years devoted to this inquiry sufficed.

### (b) Procedural Safeguards

In addition to arguing that the hearings were unfair, defendants claim that the absence of procedural safeguards required in criminal proceedings in particular, and in adjudicatory proceedings in general, by the Sixth Amendment and due process clause of the United States Constitution resulted in incomplete and biased hearings. Specifically, defendants argue that opportunities should have been provided for cross-examination, confrontation of witnesses, and disclosure of witnesses' bias. Similar arguments were rejected by a state court in 1988 when defendants unsuccessfully attempted to enjoin or limit the Commission's investigation of the District Attorney's office. *See Henry v. New York State Comm'n of Investigation*, 141 Misc.2d 849, 535 N.Y.S.2d 859 (Sup.Ct.), *aff'd*, 143

A.D.2d 914, 533 N.Y.S.2d 690 (2d Dep't 1988).

As an investigating agency, the Commission must conduct its proceedings in accordance with its enabling act and Civil Rights Law section 73 of the New York Code, which sets forth the procedures governing investigating agencies. Section 73 guarantees, *inter alia,* that witnesses summoned to hearings shall have the right to be accompanied by a counsel, *id.* at § 73(3), that witnesses shall have the right at the conclusion of an examination to file a brief sworn statement for incorporation in the record, *id.* at § 73(5), and that any person "whose name is mentioned or who is specifically identified and who believes that testimony or other evidence given at a public hearing or comment made by any member of the agency or its counsel ... tends to defame or otherwise adversely affect his reputation shall have the right, either to appear personally before the agency and testify in his own behalf as to matters relevant ... or in the alternative at the option of the agency, to file a statement of facts under oath ... which statement shall be incorporated in the record...." *Id.* at § 73(6). At the close of the trustworthiness hearing witness Kennedy, the assistant counsel who took a lead role in preparing the SIC report, stated that the Commission had adhered to these procedures. He testified that Suffolk County had, during the course of the investigation, been alerted by the Commission to the possibility that there would be adverse findings—specifically those read to the jury in the federal action. The court finds this witness's testimony credible.

Both state and federal courts have upheld the procedures followed by the Commission in conducting investigative hearings. *See, e.g., Liberal Party v. Commission of Investigation,* 579 F.Supp. 755, 756 (E.D.N.Y.1984); *Henry v. New York State Comm'n of Investigation,* 141 Misc.2d 849, 535 N.Y.S.2d 859, 865 (Sup.Ct.) (procedures governing SIC have "passed constitutional muster"), *aff'd,* 143 A.D.2d 914, 533 N.Y.S.2d 690 (2d Dep't 1988); *People v. Mitchell,* 40 A.D.2d 117, 338 N.Y.S.2d 313, 319 (3d Dep't 1972). Defendants do not argue

that the procedures followed by the Commission in the Suffolk County investigation differ from those followed in previous investigations. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1125, 1147, 1148 (E.D.Pa.1980) (fact that agency complied with its own procedures governing hearings should be given appropriate weight in evaluating trustworthiness of report). Their argument that the report must be excluded on the grounds that the Commission failed to afford witnesses and targets of the investigation additional procedural safeguards has no merit. *Cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defence Council, Inc.,* 435 U.S. 519, 543–45, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978) (prohibiting federal courts, in the absence of "extremely compelling circumstances," from requiring agencies to use procedures in addition to those mandated by statute).

In *Henry v. New York State Comm'n of Investigation,* 141 Misc.2d 849, 535 N.Y.S.2d 859 (Sup.Ct.), *aff'd,* 143 A.D.2d 914, 533 N.Y.S.2d 690 (2d Dep't 1988), the State Supreme Court held that the Commission was not required to grant the targets of its investigation the same Sixth Amendment and due process guarantees that are necessary in criminal proceedings. *Henry* is not dispositive of evidentiary determinations governed by the federal rules and committed to the discretion of the federal trial judge. It is, nevertheless, appropriate to consider as part of an inquiry into the trustworthiness of the SIC report state court decisions upholding the constitutionality of the Commission's antecedent investigation.

The *Henry* court noted that New York State has accepted the holding of *Hannah v. Larche,* 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). There the United States Supreme Court held that the rules governing the procedures of a purely investigative government agency need not provide the full panoply of judicial procedures required in prosecutorial or adjudicatory proceedings by the Sixth Amendment, the due process clause or the Administrative Procedure Act. *Henry v. New York State*

*Comm'n of Investigation,* 141 Misc.2d 849, 535 N.Y.S.2d 859, 863–65 (Sup.Ct.), *aff'd,* 143 A.D.2d 914, 533 N.Y.S.2d 690 (2d Dep't 1988). New York State courts, like the federal courts, have found that purely investigative legislative or executive agencies need not disclose the identity of persons submitting complaints, need not afford witnesses or those being investigated the right to cross examine witnesses or complainants and need not inform persons whose conduct is under investigation of the specific charges being investigated or the identity of the complainants. *Id. See Hannah v. Larche,* 363 U.S. 420, 441–43, 80 S.Ct. 1502, 1514–15, 4 L.Ed.2d 1307 (1960)). As the *Hannah* Court commented, "[I]f investigative hearings were transformed into trial-like proceedings, .... [f]act-finding agencies without any power to adjudicate would be diverted from their legitimate duties and would be plagued by the injection of collateral issues that would make the investigation interminable." *Id.* at 443, 80 S.Ct. at 1515.

Nor is there any indication that the procedures followed by the other investigative bodies or tribunals whose conclusions were referred to in the SIC report, *e.g.,* the Suffolk County Bar Association, were so defective as to render subsequent findings unreliable. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1125, 1147 (E.D.Pa.1980) (listing as additional factor for evaluating trustworthiness "[t]he extent to which the findings are based upon findings of another investigative body or tribunal which is itself vulnerable as the result of trustworthiness evaluation"). In any event, the findings made in the SIC report are sufficiently supported by materials the Commission reviewed firsthand, and do not depend upon earlier conclusions. As the court informed the jury at the time the excerpts from the SIC report were read, *supra* at Part II D, the significance of any earlier reports is the extent to which they indicate that "the County had notice earlier than 1981 that there might have been illegal activities by police which were not sufficiently controlled."

Defendants also attempt to discredit the SIC report by arguing that it was not issued in accordance with the standards governing issuance of a grand jury report. For example, defendants point out that the SIC report was not reviewed by an impartial party prior to release. Again, the difference in functions between a grand jury and the State Investigation Commission render this distinction of little import. *See Henry,* 141 Misc.2d 849, 535 N.Y.S.2d at 865 (Commission did not usurp role of Grand Jury and fact that some of the evidence it relied upon may not be competent legal evidence is immaterial). It is sufficient that the SIC followed the proper procedures under state law and issued its report in accordance with its legislative mandate. *See* N.Y.Unconsol.Law § 7502(9) (Commission shall make such interim reports to the governor or legislature "as it shall deem advisable....") & § 7502(10) (*"By such means and to such extent as it shall deem appropriate,* the commission shall keep the public informed as to the ... problems of criminal law enforcement in the state.") (emphasis added).

Finally, to the extent that this court must make an independent determination of the trustworthiness of the hearings in the context of the Federal Rules of Evidence, rather than relying solely upon state and federal court decisions evaluating the adequacy of the procedures followed of investigatory agencies, we agree with the Third Circuit that "[r]equiring that the government report of an investigation be based on an evidentiary hearing providing an opportunity for cross examination would rob Rule 803(8)(C) of any practical utility." *In re Japanese Electronic Products,* 723 F.2d 238, 268 (3d Cir.1983). Such an onerous requirement would also subvert federal civil rights policy. *Cf. Golden State Transit Corp. v. City of Los Angeles,* —— U.S. ——, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989) ("We have repeatedly held that the coverage of [section 1983] must be broadly construed.... [so to] provide a remedy 'against all forms of official violation of federally protected rights.'") (citation omitted).

### (c) SIC's Legislative Mandate

Finally, defendants maintain that the Commission failed to stay within the confines of its own enabling legislation by improperly granting immunity, and by concealing evidence relevant to pending criminal actions. Identical allegations were dismissed in *Henry v. New York State Comm'n of Investigation*, 141 Misc.2d 849, 535 N.Y.S.2d 859 (Sup.Ct.), *aff'd*, 143 A.D.2d 914, 533 N.Y.S.2d 690 (2d Dep't 1988). State courts are, of course, the best and final interpreters of state law. *International Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 387, 106 S.Ct. 1904, 1910, 90 L.Ed.2d 389 (1986); *Herb v. Pitcairn*, 324 U.S. 117, 125–26, 65 S.Ct. 459, 462–63, 89 L.Ed. 789 (1945); *Murdock v. Memphis*, 20 Wall. 590, 636, 22 L.Ed. 429 (1875). This court is not prepared to exclude the published report of a state commission on the grounds that the investigation was conducted in violation of state law when two competent state courts have already refused, when confronted with the same arguments, to enjoin or limit the SIC investigation.

Defendants also claim that the Commission violated its legislative mandate when it conducted private hearings without any of the Commissioners attending. *See* N.Y.Unconsol.Law § 7502(11)(d) ("The commission shall not have the power to take testimony at a private hearing or at a public hearing unless at least two of its members ... are present at such hearing."). *See also* N.Y. Civil Rights Law § 73(9) ("No temporary state commission having more than two members shall have the power to take testimony at a public or private hearing unless at least two of its members are present at such hearing.").

The Commission has apparently interpreted the statutes to allow witnesses to waive their right to have commissioners present. SIC assistant staff counsel John Kennedy testified that the Commission has consistently notified the witness that he or she has a right to have Commissioners present and that the witness may demand that the hearing be adjourned until such time as they are available. His testimony is credited. This practice is not inconsistent with state law.

### 4. Motivation

The fourth criteria suggested by the Advisory Committee for evaluating the trustworthiness of a government report concerns questions of motivation. As the Court of Appeals for the Second Circuit has observed, "in most cases in which [government reports] have been excluded, there has been reason to suspect bias...." *LeRoy v. Sabena Belgian World Airlines*, 344 F.2d 266, 272 (2d Cir.), *cert. denied*, 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965) (citing, *inter alia*, *Hoffman v. Palmer*, 129 F.2d 976, 991 (2d Cir.1942), *aff'd*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943)). By bias the courts and the Advisory Committee refer principally to reports compiled in anticipation of litigation. In the instant case the inquiry more properly focuses on whether the SIC investigation was a politically-motivated, partisan attack. *See, e.g., Baker v. Firestone Tire & Rubber Co.*, 793 F.2d 1196, 1199 (11th Cir.1986) (finding Congressional report inadmissible because report consisted of "the rather heated conclusions of a politically motivated hearing"); *Pearce v. E. F. Hutton Group, Inc.*, 653 F.Supp. 810, 814 (D.D.C. 1987) (draft report of Subcommittee on Crime of the House Judiciary Committee is inadmissible under Fed.R.Evid. 803(8)(C) in part because it was produced by a politically-motivated, partisan body).

The "inflammatory language of [the Commission's] press releases" noted by the state court in *Henry v. New York State Comm'n of Investigation*, 141 Misc.2d 849, 535 N.Y.S.2d 859, 867 (Sup.Ct.), *aff'd*, 143 A.D.2d 914, 533 N.Y.S.2d 690 (2d Dep't 1988), could arguably be viewed as an indication of an underlying partisan agenda. Former Suffolk County District Attorney Patrick Henry added his own torrid rhetoric in a press release in which he characterized the Commission's report as the " 'bastard child of political rape.' " Long Island Newsday, Apr. 25, 1989. The nonpartisan makeup of the Commission, however, belies such charges so far as the investigation and report are concerned. *See, e.g.*, N.Y.

Times, Jan. 20, 1990, at 30, col. 1 (noting that for years there have been criticisms of SIC's inability or unwillingness to investigate politically sensitive topics and attributing this failure to Commission's bipartisan nature). However infelicitous and accusatory the phrases and quotes utilized in the press release were, they did not render the report unreliable, nor did they suggest unfair prejudice in the report.

Finally, as noted above in Part B of this section, the findings of the SIC report were the result of factual investigation. They were not "a function of an executive, administrative, or legislative policy judgment" and did not "represent an implementation of policy." *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 505 F.Supp. 1125, 1147 (E.D.Pa.1980) (listing this distinction as factor to be taken into consideration in evaluating trustworthiness of report).

### 5. Finality of findings

"Rule 803(8)(C) was meant to cover only final reports, not 'to piggy back the whole administrative proceeding' into the trial." *Brown v. Sierra Nevada Memorial Miners Hosp.*, 849 F.2d 1186, 1189 (9th Cir. 1988). *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 505 F.Supp. 1125, 1147 (E.D.Pa.1980) (listing finality of findings as additional factor for assessing reliability of report). *See also United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 742–43 (2d Cir.1989) (it was within district court's discretion to exclude various government reports in part because of their interim or inconclusive nature); *City of New York v. Pullman, Inc.*, 662 F.2d 910, 914–15 (2d Cir.1981), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982) (interim report issued by staff of New York City Urban Mass Transit Administration is inadmissible because it includes only "tentative results of an incomplete staff investigation"). *But cf. Meriwether v. Coughlin*, 879 F.2d 1037, 1039 (2d Cir. 1989) (admitting into evidence the last page of interim SIC report entitled "Interim Report on the Escape of Albert Victory").

We do not suggest that finality is a *sine qua non.* In many instances non-final reports may be extremely useful and reliable so far as they go. But certainly finality is a consideration favoring admission.

The SIC report was not a draft or interim report. Its findings were thoroughly considered and final.

### 6. Conclusion

An analysis of the factors generally employed by the federal courts to guide inquiries into the trustworthiness of public records and reports under Rule 803(8)(C) and the need to introduce them, supports admission of the excerpted findings from the SIC report.

### D. *Other Factors* (Rules 102, 104(a), 608(a), 611(a), 803(24), 1006)

The trial court is given broad discretion to control the trial by the Federal Rules of Evidence. *See, e.g.,* Rule 102 ("rules shall be construed to secure fairness ... to the end that the truth may be ascertained and proceedings justly determined"); Rule 104(a) (court not bound by rules of evidence in determining admissibility); Rule 611(a) ("court shall exercise reasonable control over ... presenting [of] evidence ... for the ascertainment of the truth ... [and to] avoid needless consumption of time"); Rule 803(24) (admissibility depends upon court determination that "interests of justice will best be served"). In controlling the trial the court will necessarily consider 1) whether the jury is in a position to properly evaluate the evidence before it without further help and 2) the amount of time the evidence will require as compared to alternate forms of proof. These general administrative considerations for the judicial officer presiding at the trial are designed to carry out the direction and policy of Rule 102. They are related to, but much broader in scope, than the special factors set out in Rule 403. *See* Part VI, *infra.*

### 1. Ability of jury to assess accuracy

A lay jury is fully capable of assessing the probative force of the findings made by the State Investigation Commission. The SIC report did not contain or depend upon highly technical information. The kind of data upon which the findings were based was within the general knowledge of a

reasonably well-informed person. In addition, the jury was fully capable of discounting the probability of the accuracy of this hearsay in the context of the facts of this case, particularly since the jury heard testimony from the individual police officers and from the Assistant District Attorney who tried the criminal case against Gentile and Rydstrom. Given the non-technical nature of the report and the firsthand ability of the jury to assess the testimony of the police department and District Attorney Office personnel involved in the case, it is unlikely that the jurors would be misled and overvalue the report to the detriment of the defendants.

### 2. Trial Time Saving

Allowing government reports such as the SIC report to be admitted under Rule 803(8)(C) saves considerable trial time and thus fulfills one of the primary purposes of the Federal Rules of Evidence—namely, the "elimination of unjustifiable expense and delay." Fed.R.Evid. 102. Several of the federal rules were drafted to reflect this concern. For example, Rule 403 provides for the exclusion of relevant evidence if its probative value is outweighed by "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See* discussion *infra* at Part VI. The limitations contained in Rule 608, which allows character evidence in support of a witness' credibility to be admitted only after the witness' character has first been attacked, were justified by the drafters of the rule by the necessity of avoiding the "enormous needless consumption of time which a contrary practice would entail." Advisory Committee Note to Fed.R.Evid. 608(a), 56 F.R.D. 183, 268 (1972). Rule 611 requires the court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to ... avoid needless consumption of time...." *See also* Advisory Committee Note, 56 F.R.D. 183, 273 (1972). Similarly, Rule 1006 allows summaries and charts to be presented where the "contents of voluminous writings, recordings, or photographs" can not be conveniently examined in court.

The evidence rules that contain time-saving provisions are, in large part, "statutory enactment[s] of ... common law doctrine[s] that a court has inherent power to control its calendar." *United States v. Algie,* 503 F.Supp. 783, 794 & n. 37 (E.D.Ky. 1980) (Rules 403 and 611), *rev'd on other grounds,* 667 F.2d 569 (6th Cir.1982). *See Cranberg v. Consumers Union, Inc.,* 756 F.2d 382, 391 (5th Cir.), *cert. denied,* 474 U.S. 850, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985) (not only does Rule 611(a) put affirmative obligation on the judge to avoid consumption of time, but, as common law judge, he or she has overall responsibility to see that the trial is not subject to delay) (citing *Ruiz v. Estelle,* 679 F.2d 1115, 1129 (5th Cir.1982), *modified,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983)); *In re Summa T Corp.,* 73 B.R. 388, 392 (Ark. 1987) (Rule 1006). *See also Carter v. Hewitt,* 617 F.2d 961, 968–69 nn. 6, 8 (3d Cir. 1980) (pre-Rule cases may be regarded as authority for interpreting Rules where rule is in essence a codification of common law approach). Nor are the Federal Rules of Evidence the only Congressional codifications of common law proscription of undue delay. *See, e.g., Van Dusen v. Barrack,* 376 U.S. 612, 616 & n. 4, 84 S.Ct. 805, 809 & n. 4, 11 L.Ed.2d 945 (1964) (purpose of transfer statute, 28 U.S.C. § 1404(a) is in large part to avoid wasting time and has its roots in common law doctrine of *forum non conveniens*); *Link v. Wabash R.R. Co.,* 370 U.S. 626, 629–31, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962) (trial judge's power under Federal Rules of Civil Procedure to dismiss a case for failure to prosecute is necessary to avoid undue delays and is rooted in common law).

Avoidance of undue delay is of particular importance in civil rights cases brought against municipalities under section 1983. Were reports such as the SIC report to be excluded, plaintiffs would be forced to introduce proof of innumerable individual incidents of police and prosecutorial misconduct in order to show that a municipal practice, policy or custom existed. This would make it difficult, if not impossible, for many deserving plaintiffs to prevail, thereby frustrating federal civil rights policy. Such a limitation would also needlessly

duplicate—at great cost to the parties, the court and the taxpayers—the work of a competent agency already vested with the expertise and legislative authority to conduct such inquiries.

An example of the extreme difficulty involved in trying multiple incidents of police misconduct is *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). In that pre-*Monell* section 1983 case, two class actions were brought against the mayor of Philadelphia, the police commissioner and others, alleging a pervasive pattern of illegal and unconstitutional police mistreatment of minority citizens in particular and Philadelphia residents in general. The defendants were charged with expressly authorizing or encouraging mistreatment as well as with failing to act to avoid recurrence. The District Court heard "some 250 witnesses during 21 days of hearings [and was] faced with a staggering amount of evidence." *Id.* at 367, 96 S.Ct. at 602. As the Supreme Court observed, "each of the 40–odd incidents might alone have been the piece de resistance of a short, separate trial." *Id.* The District Court expressly considered and made findings of fact resolving conflicts in the testimony offered regarding each of these incidents. *Id.*

At the conclusion of these extensive proceedings, the *Rizzo* trial court found that there was a tendency on the part of the police department "to discourage the filing of civilian complaints and to minimize the consequences of police misconduct," *id.* at 368–69, 96 S.Ct. at 602–03, and that "in the absence of a change in police disciplinary procedures, the incidents are likely to continue to occur...." *Id.* at 371, 96 S.Ct. at 604. The Court of Appeals affirmed the finding that the "existing procedures for handling citizen complaints were 'inadequate.'" *Id.* at 365–66, 96 S.Ct. at 601–02. The Supreme Court reversed on the pre-*Monell* ground that there was insufficient basis for an injunction.

Had this court taken the same route as the district court in *Rizzo*, the seven day trial of the case at bar might well have stretched into seven months. Because of the many criminal cases on the court's docket which must be given priority, this time is not available. Preparation for the trial would have taken years longer than it did. As noted *supra*, the cost to the parties would in all likelihood be prohibitive. Even assuming plaintiffs were able to finance such an inquiry, the passage of additional years would undoubtedly render it more difficult to duplicate the SIC investigation. Section 1983 cases alleging a practice or policy are difficult enough to prove without erecting an all but insurmountable barrier out of the Federal Rules of Evidence.

## VIII. PREJUDICE (RULE 403)

■ The court is not unaware of the danger that "the jury may [be] influenced by the official character of the report to afford it greater weight than it [is] worth." *Bright v. Firestone Tire & Rubber Co.*, 756 F.2d 19, 23 (6th Cir.1984). *See also City of New York v. Pullman Inc.*, 662 F.2d 910, 915 (2d Cir.1981) (government reports have "'aura of special reliability'") (citation omitted), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982). Where, as here, the problems of proof are extremely difficult and require reliance upon hearsay evidence, it is important to carefully consider the prejudicial effect admission of the report may have. *Compare e.g., Gutierrez–Rodriquez v. Cartegena*, 882 F.2d 553, 573–74 (1st Cir.1989) (case files detailing prior misconduct of individual defendant are admissible under 803(8)(C) for purpose of determining supervisory response and liability where no other, less prejudicial methods of proof are available) *with Carter v. District of Columbia*, 795 F.2d 116, 126 (D.C.Cir.1986) (trial judge's limiting instruction that evidence concerning past complaints against individual police officers was admitted solely for purpose of establishing municipal liability did not cure unfair prejudicial effect to individual defendants as long as possibility existed that less prejudicial evidence could have been introduced).

Federal Rule of Evidence 403 "grants the trial judge broad discretion to determine whether to allow the introduction of relevant, but prejudicial, matters into evidence." *Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 327 (2d Cir.1986), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94

L.Ed.2d 698 (1987) (district court judge did not abuse his discretion in section 1983 case by admitting proof as to the assertion of numerous other claims of police brutality, even though none had yet been adjudicated in favor of claimant). Rule 403 was not, however, intended to be used to exclude evidence merely because it damages or discredits a party's claim. *See. e.g., Kelsay v. Consolidated Rail Corp.,* 749 F.2d 437, 443 (7th Cir.1984) (unfair prejudice within the meaning of Rule 403 is not to be equated with a test of simply having an adverse effect on the opposing party's case).

The jurors in the instant case struck the court as a skeptical and self-reliant group unlikely to be swayed by undue deference to unseen state commissioners. Jurors from the Eastern District of New York can be expected to resist being influenced by the conclusions of a government report, particularly where they concern such a serious subject. Yet, there is a risk that some jurors may be overawed. In deference to this concern the court permitted only excerpts, rather than the entire 199–page report to be admitted. It accompanied the reading of the factual findings with limiting instructions. *See* Advisory Committee Note to Fed.R.Evid. 403, 56 F.R.D. 183, 219 (1972) ("In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probably effectiveness or lack of effectiveness of a limiting instruction."). *See also In re Plywood Antitrust Litigation,* 655 F.2d 627, 637 (5th Cir.1981) (district judge "carefully and extensively edited" findings "to eliminate any possible prejudice to defendants"), *cert. dismissed,* 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983). In addition, the defendant County was permitted to introduce findings of its own from the report—*e.g.,* that "[t]he Commission feels confident that the vast majority of police and prosecutorial personnel in Suffolk are persons of ability, industry and integrity." SIC Report at 23.

The court also limited possible prejudice by refusing to admit the report in evidence so that it could be taken into the jury room where it might continue to speak. This is a protection embodied in the Rules in those circumstances where probative force of the written word might be overvalued. *See* Rule 803(5) (recorded recollection); Rule 803(18) (learned treatises).

The credibility of a government report and the weight attached to it are matters to be decided by the trier of fact. *Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 805 F.2d 49, 54 (2d Cir.1986) (citing *Rosario v. Amalgamated Ladies Garment Cutters' Union,* 605 F.2d 1228, 1251 (2d Cir.1979), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980)). The Supreme Court has observed that "the admission of a report containing 'conclusions' is subject to the ultimate safeguard—the opponent's right [at trial] to present evidence tending to contradict or diminish the weight of those conclusions." *Beech Aircraft v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 449, 102 L.Ed.2d 445 (1988). *See, United States v. Hudson,* 884 F.2d 1016, 1022–23 (7th Cir.1989)·(Congress did not intend to allow reports admitted under 803(8)(C) to escape rigorous scrutiny; such scrutiny serves policy favoring admission and retains desirability of careful scrutinization of reliability) (citations omitted); *Ellis v. International Playtex, Inc.,* 745 F.2d 292, 303 (4th Cir.1984) (same). In the case at bar defendants knew in advance of the trial that plaintiffs intended to offer the SIC report, but failed to introduce any evidence during trial to contradict or diminish its weight.

The trustworthiness and probative value of the SIC report, considered in conjunction with the limiting instructions given by the court, other protections afforded defendants and the opportunity defendants were given to produce evidence in derogation of the report, adequately protected against the risk that the excerpts read to the jury may have had an unfair prejudicial effect. Rule 403 does not require the court to exclude the best available evidence supporting plaintiffs' *Monell* claim.

IX. Conclusion

Defendants have not introduced credible proof that the factual findings read to the jury were unreliable. The report was relevant and trustworthy. The jury was in a position to evaluate it responsibly. Its in-

troduction saved a considerable amount of time. Probative force far outweighed unfair prejudice.

Defendant Suffolk County need not be concerned that our decision will amount to an open season for section 1983 cases based on police or prosecutorial misconduct. Each case will be considered by the trial judges of this district with sensitivity to the needs of both plaintiffs and the County. The inherent incredibility of the testimony of the defendants in the instant case, which led to an unusual reversal of the criminal convictions and dismissal of the indictments, is presumably a rare occurrence. Finally, the SIC report has limited application, if any, to incidents occurring outside of the 1981–1988 period.

Defendants' motion for a judgment notwithstanding the verdict is denied. Enter judgment for plaintiffs.

So Ordered.